In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-3991

LAURA PHELAN,

*Plaintiff-Appellant,*

*v.*

COOK COUNTY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 3638—**George M. Marovich**, *Judge.*

ARGUED SEPTEMBER 21, 2005—DECIDED SEPTEMBER 18, 2006

Before COFFEY, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* This case examines whether a Title VII plaintiff who is wrongly terminated should be foreclosed from pursuing her claims where her employer eventually reinstates her with back pay. Plaintiff Laura Phelan brought this suit against her employer and eight co-workers and supervisors under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1983, alleging sexual harassment, gender discrimination, race discrimination, and retaliation. Phelan also brought state law claims of assault, battery and intentional infliction of emotional distress against three of her co-workers. The district court granted summary judgment in favor of the defendants on all of the federal claims, and then

declined to exercise supplemental jurisdiction over the state claims. Primarily because the district court erroneously found that Phelan was not subject to an adverse employment action, we reverse the grant of summary judgment with regard to all but one of Phelan's Title VII claims and remand for further proceedings consistent with this opinion. We affirm the district court's grant of summary judgment on Phelan's Section 1983 Claims.

## I.  BACKGROUND

Laura Phelan began working as a mechanical assistant in the boiler room (also known as the "Powerhouse") of Cook County Hospital on March 1, 1999. The boiler room is part of Cook County's Buildings and Grounds Department. Cook County did not provide Phelan, a Caucasian woman, with either an orientation packet or a copy of the hospital's sexual harassment policy at the start of her employment.

Phelan's co-workers in the boiler room began subjecting her to various abusive behaviors immediately after she began working there. She was the target of sexually offensive comments and solicitations, sexually offensive touching and displays of pornography. On multiple occasions, Phelan's co-workers told her that, in order to survive in the department, she would need to perform sexual acts.

On April 15, 1999, after Phelan complained to her supervisor, Jack Callaghan, about this behavior, Callaghan contacted Lucia Kelly-Freeman in Cook County's Department of Human Resources. Kelly-Freeman was responsible for investigating complaints of sexual harassment. On April 20, 1999, Phelan and Kelly-Freeman met to discuss Phelan's complaints. Phelan informed Kelly-Freeman that she had been the target of sexually abusive actions. Kelly-Freeman instructed Phelan to create a log of the incidents and to report back to her. However, Phelan did not immedi-

ately do so because Callaghan told her that she should not have further contact with Kelly-Freeman.

On July 14, 1999, Phelan again met with Kelly-Freeman to discuss the harassment. Kelly-Freeman had taken no action with regard to Phelan's case since the first meeting, stating that she had been waiting for Phelan to report back to her with further details. At this second meeting, Phelan showed Kelly-Freeman a bruise on her thigh, which she said was the result of a July 9, 1999 incident in which two of her co-workers physically assaulted her. Kelly-Freeman notified her supervisor of the incident and directed Phelan to file an incident report and receive medical treatment. Phelan subsequently met with members of the Cook County Hospital Police Department and the Chicago Police Department. She identified co-workers Ronald Jotzat and John Hussak in a photo-lineup prepared by the Cook County Hospital Police and signed criminal complaints against them. Phelan was notified by the Cook County Hospital police that she needed to file a report with the Chicago Police Department to further the prosecution of her case, but, after speaking with the CPD officers, she did not file a report. The two hospital employees who assaulted Phelan were suspended without pay while the matter was investigated. Phelan was directed not to report back to work until a suitable resolution was determined and she was notified that she would be paid while the hospital sought to resolve the situation.

On August 5, 1999, Phelan met with Claudette Giles, one of the hospital's human resources supervisors, and Paris Partee, an assistant administrator at the hospital who was second in command in the human resources department. In the course of this meeting, Giles and Partee told her that she could either accept a transfer to the hospital's CORE Center, where she would work as a medical assistant, or she would be terminated. The CORE Center was also part of the Buildings and Grounds Department. Phelan claims

that the two women, who are African American, made derogatory references to her race and gender during this meeting, including referring to her as a "stupid white woman." Phelan ultimately signed a memorandum acknowledging her acceptance of a transfer to the CORE Center.

Phelan's problems with co-workers continued after her transfer to the CORE Center. At one point, one of Phelan's CORE Center supervisors, Ronald Silva,[1] placed Phelan in a headlock. Phelan states that she informed Callaghan of this incident and that he stated he would address it. Callaghan denies making these statements. The next day, Phelan encountered Silva in an elevator, and he again put Phelan in a headlock. One of Phelan's supervisors at the CORE Center, Chuck Gunther, witnessed the second attack and forced Silva to remove Phelan from the headlock. Employees at the CORE Center also subjected Phelan to gender-related verbal abuse and other offensive conduct. Phelan reported these incidents to the human resources department, but she did not file a formal complaint.

In July of 2000, Phelan did not report for work and called in sick. The reason for her non-attendance was distress over the treatment she had received from her co-workers and the inadequate response from human resources and management. She began seeing a psychiatrist, who diagnosed her as suffering from major depression and post-traumatic stress disorder.

As a result of these psychological and emotional problems, in August of 2000, Phelan applied for a medical leave of

---

[1] Phelan's appellate brief repeatedly refers to Silva as a "supervisor." Appellees do not contest this labeling in their responsive brief, and Silva's deposition testimony seems to support Phelan's description, at least in the generic sense of the word "supervisor." *See* Deposition of Ronald Silva (Silva Dep.) at 13. We address the question of whether any of Phelan's harassers were supervisors for the purposes of Title VII later in this opinion.

absence. Cook County denied the request. On September 20, 2000, Callaghan sent Phelan a letter notifying her of an impending pre-disciplinary hearing to determine whether Phelan's absence from work necessitated her termination. On October 11, 2000, after Phelan had been absent from work for 58 days, Cook County held the hearing, which Phelan attended. After being selected by Callaghan, Partee acted as the hearing officer. At the conclusion of the hearing, Partee concluded that Phelan should be terminated, and Cook County terminated Phelan's employment. Phelan later appealed the result of the hearing.

On February 7, 2001, Phelan filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and the Illinois Department of Human Rights. On February 9, 2001, Cook County reversed its decision to terminate Phelan, at which point Phelan was reinstated to her job at the CORE Center and awarded back pay. On April 25, 2001, Phelan received a notice of right to sue on the basis of her EEOC Charge. Phelan filed her Complaint in the instant case on May 17, 2001.

After discovery was completed, the district court granted the defendants' motion for summary judgment as to the federal claims, and declined to exercise supplemental jurisdiction over the remaining state law claims. This appeal followed.

## II.  ANALYSIS

### A.  Standard of Review

Our review of the district court's grant of summary judgment is de novo, and we must construe all facts and reasonable inferences in favor of Phelan. *See Telemark Dev. Group, Inc. v. Mengelt*, 313 F.3d 972, 976 (7th Cir. 2002). Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.  Statute of Limitations**

The defendants first argue that Phelan's claims are barred by the statute of limitations because she failed to timely file her EEOC Charge, and because her complaint was filed too late for her to pursue her Section 1983 claims. We have held that "the scope of the subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC." *Rush v. McDonald's Corp*, 966 F.2d 1104, 1110 (7th Cir. 1992). However, in *Rush*, we also observed that "the goals behind the requirement of prior resort to administrative relief would be frustrated if the filing of a general charge with the EEOC would open up the possibility of judicial challenges to any related conduct that took place in connection with the employment relationship." *See id.* Here, both of the defendants' statute of limitations arguments fail as they are predicated upon the defendants' incorrect assertion that Phelan's EEOC Charge and Section 1983 claims refer only to incidents alleged to have occurred at the Powerhouse and not in the CORE Center.

Nothing in the EEOC Charge or the Complaint's Section 1983 paragraphs limits Phelan's allegations to the Powerhouse; the Complaint references "gender discrimination within the Buildings and Grounds Department of the Hospital." Complaint ¶ 23. It is undisputed that both the Powerhouse and the CORE Center are within the Buildings and Grounds Department. The EEOC Charge references discriminatory actions taken up until and including her termination. *See* EEOC Charge at 12 ("As a direct and proximate result of the Respondents' gender discrimination, sexual harassment, racial discrimination, and retaliation

against Phelan and the continued complaints she made in connection with said conduct, Phelan was terminated from her position at Cook County on October 11, 2000."). The Complaint explicitly refers to incidents that occurred after the transfer to the CORE Center. *See* Complaint ¶ 30 ("In July 2000, Phelan was put into a headlock by Defendant Silva. In July 2000, Phelan was cornered in an elevator by Defendant Silva who was attempting to physically choke Phelan with his hands."); Complaint ¶ 46 ("The Defendants retaliated against the Plaintiff by denying her medical leave of absence and by terminating the Plaintiff's employment on October 11, 2000."). The EEOC Charge also specifically refers to the actions taken by Silva in July of 2000. *See* EEOC Charge at 9 ("Phelan was put into a head-lock by a male worker"). Thus, the defendants' argument that "[h]ere, like Phelan's Title VII Claims, all of Phelan's Section 1983 Claims are pled to involve only those alleged discriminatory actions that occurred while she worked at the Powerhouse and before her transfer to the CORE Center on August 5, 1999," is invalid. *See* Appellee's Br. at 21. Since it is clear that the allegations of the EEOC Charge and the Complaint are sufficient to defeat the defendants' statute of limitations arguments, we need not address Phelan's argument that the defendants waived these arguments by failing to raise them in either the motion to dismiss or the motion for summary judgment.

## C. Gender Discrimination

Phelan's Title VII gender discrimination claim should have gone to a jury. A Title VII gender discrimination claim can survive summary judgment if the plaintiff presents either direct or circumstantial evidence of discrimination (the "direct method") or indirect evidence that satisfies the three-part, burden shifting test outlined in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973) ("the indirect method"). *See Durkin v. City of Chicago*, 341 F.3d 606, 613 (7th Cir. 2003).

### 1.   Direct Method of Proof

Phelan's claim should have survived summary judgment because, relying on the direct method of proof, she provided sufficient circumstantial evidence of discrimination to meet the requirements for a Title VII claim.[2] While the typical direct method situation is an admission of discriminatory animus by the employer, we have stated that "[a] plaintiff can also prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (internal citation and quotation marks omitted). For Phelan to defeat summary judgment in this manner, "[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class." *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994). However, "[w]hether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action." *Rhodes*, 359 F.3d at 504. The defendants argue that Phelan failed to demonstrate adverse employment action. We disagree.

Phelan's four-month termination, beginning on October 11, 2000, constituted an adverse employment action. That Phelan was reinstated to her position in February of 2001 does not negate the fact that her termination consti-

---

[2]   Because Phelan produced sufficient evidence under the direct method, we need not address whether she should have also prevailed under the indirect method.

tuted an adverse employment action. It is undisputed that Phelan was terminated in October of 2000, and, were we to disregard her subsequent reinstatement, this termination would unquestionably constitute an adverse employment action, as a member of the class of "[c]ases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished." *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002); *see also Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (termination was adverse employment action); *Lang v. Illinois Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("The parties do not dispute that Lang engaged in protected activity by filing his charge with the EEOC, or that his termination constituted an adverse employment action."). The only question is whether the fact that Cook County later reinstated Phelan and awarded her back pay somehow negates her right to pursue her Title VII claims. We believe that it does not, since the only purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the type of conduct actionable under the statute. *See Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000) ("The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace."). Consistent with Title VII's goal of deterring discrimination, we decline to endorse a rule that would allow employers to escape liability by merely reinstating the aggrieved employee months after termination, whenever it becomes clear that the employee intends to pursue her claims in court. Such a rule could create an unintended economic incentive for employers to reinstate an employee who files a discrimination suit as means to avoid Title VII penalties whenever the costs of reinstating the employee are lower than the employer's exposure in an Title VII suit. As the Supreme Court has explicitly stated, the "primary objective" of Title VII "is

not to provide redress but to avoid harm." *Faragher v. City of Boca Raton*, 524 U.S. 775, 805-06 (1998).

We find persuasive the reasoning of the Second and Sixth Circuits, which have concluded that the reinstatement of an employee after a lengthy suspension from work does not prevent the employee from pursuing Title VII claims, even where back pay was awarded. *See White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 791 (6th Cir. 2004) ("a thirty-seven day suspension without pay constitutes an adverse employment action regardless of whether the suspension is followed by a reinstatement with back pay."), *aff'd*, 548 U.S. ___, 126 S. Ct. 2045 (2006) (No. 05-259);[3] *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (finding that one-week "suspension without pay is sufficient to constitute an adverse employment action" even where plaintiff was later reimbursed). If a suspension that ends in reinstatement and reimbursement can constitute an adverse employment action, it follows that reinstatement and reimbursement do not bar a finding of adverse employment action where there was an actual termination, which is a more serious action than suspension. As our sister circuit concluded in *White*, a rule

---

[3] The Supreme Court recently rendered its opinion in *White*, affirming the Sixth Circuit and defining the appropriate test for Title VII retaliation claims. While the Sixth Circuit's discussion of "adverse employment action" addressed this concept for the purposes of both discrimination and retaliation claims, the Supreme Court specifically limited its analysis to retaliation claims, drawing a distinction between the "materially adverse" action required to sustain a retaliation claim and the action required to sustain a discrimination claim. *See White*, 126 S. Ct. at 2414-2416. Nevertheless, our conclusion that Phelan suffered an adverse employment action is not undermined by the Court's conclusion that the Title VII retaliation provision protects an employee from a wider range of conduct than the discrimination provision does.

that prevented the finding of an adverse employment action where the terminating or suspending employer later reinstated the employee would "allow[ ] an employer unilaterally to cut off the employee's claims for other damages, which have been explicitly authorized by Title VII since the Civil Rights Act of 1991, such as interest on the back pay, attorney's fees, emotional suffering, and punitive damages." *See White*, 364 F.3d at 802 (citing 42 U.S.C. §§ 1981a(b); 2000e-5(g), (k)). Phelan's time away from work was longer than the 37-day suspension in *White* or the one-week suspension in *Lovejoy*—her termination lasted for four months. This was certainly enough time for Phelan to be measurably injured by the termination, both financially and emotionally, regardless of whether back pay was later awarded.

Having addressed this prerequisite, we find that a reasonable trier of fact, examining the mosaic of evidence in this case, could infer that Phelan's termination was motivated by intentional discrimination. This court has observed that there are three means by which a plaintiff can defeat summary judgment using circumstantial evidence under the direct method. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005) (citing *Troupe*, 20 F.3d at 726). The first is through the demonstration of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second is through evidence that a similarly situated employee received more favorable treatment, and the third is through "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief." *Id.*

Phelan has produced an abundant body of evidence sufficient to establish a question of material fact under the first circumstantial evidence method described in *Rudin*; the record contains numerous gender-related comments from supervisors and co-workers. There is undisputed evidence that Phelan was physically assaulted by multiple employees, including one of her supervisors, and evidence that their motivations were gender-related.

In *Volovsek v. Wisconsin Department of Agriculture, Trade, and Consumer Protection*, 344 F.3d 680, 689-90 (7th Cir. 2003), we concluded that the plaintiff had produced sufficient evidence to reach the jury under the direct method where she overheard her supervisors speaking about "keeping them barefoot and pregnant" shortly before she was denied a promotion. We observed that the temporal proximity of the gender-related comment to the alleged act of discrimination created an issue of material fact. *See id.*

Here, Phelan has introduced evidence that she was body-slammed into her desk by two men, repeatedly placed in a headlock by another, and instructed repeatedly that her workplace was "no place for a woman." There is also evidence that when Phelan complained on multiple occasions to her supervisors and to Human Resources, she was rebuffed and even insulted. Phelan testified in her deposition that Callaghan instructed her to stop contacting Human Resources regarding the harassment from her co-workers; a reasonable factfinder could construe this as an attempt by Phelan's direct supervisor to prevent Phelan's harassment from coming to light. Callaghan also told Phelan that her problems stemmed from the fact that she was trying to work "in a man's world," and stated that "[i]f you leave right now, it will make a better life for you." To the extent that the discriminatory nature of either of these statements is ambiguous, we note that "the task of

disambiguating ambiguous utterances is for trial, not for summary judgment." *See Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990) (concluding that Title VII plaintiff could defeat summary judgment under direct method with ambiguous, potentially discriminatory comments made by supervisor). Furthermore, Phelan testified that Human Resources staff members threatened to orchestrate her termination if she continued to complain about her gender-related mistreatment. The importance of these facts is underscored by Callaghan's role in selecting Partee as the hearing officer for Phelan's termination hearing. Partee made discriminatory comments to Phelan before ultimately acting as the person who would conclude she should be terminated. The suspicious timing in this case arises from the fact that Phelan was terminated shortly after filing a leave request that was arguably necessitated by the verbal and physical abuse she had suffered. Cook County was aware of the violence and verbal abuse Phelan had experienced, and yet it undisputedly (and inexplicably) failed to process her request for medical leave. The record also supports the conclusion that Phelan's termination was unjustified—Cook County's internal review later found that Phelan's leave request was appropriate and that she should not have been terminated. We emphasize that Phelan's allegations and the evidence she has introduced opposing summary judgment are not established facts. Only after a trial can it be determined what did and did not occur. But a reasonable jury could have considered all of this evidence and concluded that the decision to terminate Phelan was motivated by her gender. The district court thus erred in granting summary judgment.

## D.  Hostile Work Environment

Phelan also contends that the district court erred in granting summary judgment on her Title VII hostile work

environment claim. Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). One of the implications of this provision is that employers can become liable if an employee's work environment is discriminatorily hostile or abusive. *See Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). Cook County "is liable for a hostile work environment claim if the plaintiff's supervisor created the hostile work environment, or if a co-worker created the hostile work environment and the employer was negligent either in discovering or remedying the harassment." *See id*. In order to succeed on her hostile work environment claim, Phelan was required to show that:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists. *Durkin*, 341 F.3d at 611. The only question in this appeal relates to the fourth prong of the test— whether a "basis for employer liability exists."

## 1. Strict Liability for Sexual Harassment

"Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action." *Rhodes*, 359 F.3d at 505. As discussed above, Phelan suffered an adverse employment action, so the

question with regard to strict liability is whether Phelan introduced sufficient evidence that at least one of her harassers was her supervisor for the purposes of Title VII. Phelan cannot demonstrate the existence of an issue of material fact with "evidence that *anyone* with managerial authority engaged in sexual harassment." *See id.* (emphasis added). Rather, Phelan must demonstrate that "that the harasser served specifically as her supervisor." *Id.* The term "supervisor" has special meaning within the context of a Title VII lawsuit. "A supervisor is someone with the power to *directly* affect the terms and conditions of the plaintiff's employment." *Id.* (emphasis in original).

In *Rhodes*, we concluded that the plaintiff could not demonstrate that her alleged harassers were Title VII supervisors where the harassers "managed Rhodes' work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations to the Department Administrative Services Manager." *Id.* at 506. Neither of the alleged harassers "had authority to make any decisions affecting the terms and conditions of Rhodes' employment, i.e., the authority to hire, fire, promote, demote, discipline or transfer Rhodes." *Id.*

The situation is different here. Phelan argues that either Callaghan or Partee, both alleged harassers, constituted a Title VII supervisor.[4] Callaghan supervised all of Phelan's work at Cook County. He testified at his deposition

---

[4] Phelan's brief refers to Silva as a "supervisor" and Cook County has failed to contest the supervisory status of Silva, the most egregious harasser. However, Phelan has not pressed the inquiry into Silva's Title VII supervisory status in her briefs, and the record is insufficient for us to conclude that he is a supervisor for Title VII purposes. We therefore do not consider him in our assessment of whether Cook County should be subject to strict liability.

that he was directly responsible for Phelan's performance evaluations. He held the power to call for a disciplinary hearing, a power which he exercised in Phelan's situation. There is evidence that Callaghan was at least partially responsible for the selection of the hearing officer. Ultimately, because of Cook County's system for handling terminations, Callaghan did not have the final say as to whether Phelan was terminated, but we do not believe that he should avoid being a supervisor for Title VII purposes simply because Cook County employed a final administrative step involving the Human Resources Department. This is particularly true here since Callaghan triggered the termination hearing, selected the hearing officer, and provided information critical to the termination decision.

Partee might also be considered a Title VII supervisor since, as a Human Resources Officer and as Phelan's hearing officer, she appears to have had what amounts to ultimate authority to fire Phelan. *See Rhodes*, 359 F.3d at 506. Phelan testified that Partee was a direct participant in her sexual harassment. Partee's role as a Human Resources employee does not, however, fit the typical mold of a Title VII supervisor. But Cook County's system seems to divest any one individual of all of the powers that our cases have traditionally associated with the Title VII supervisor. It would be an odd result if an employer could escape the possibility of strict liability for supervisor harassment simply by scattering supervisory responsibilities amongst a number of individuals, creating a Title VII supervisory Hydra. Indeed, in the context of Title VII discriminatory termination suits we have concluded that employers are liable where a supervisor uses a human resources committee as his "cat's paw"—the conduit of his prejudice. *Cf. Shager*, 913 F.2d 398, 405 (7th Cir. 1990) ("A committee of this sort, even if it is not just a liability shield invented by lawyers, is apt to defer to the judgment of the man on the spot."). We think that

between Callaghan and Partee all of the supervisory authority necessary to invoke strict liability likely existed. There is evidence that both of these individuals were involved in Phelan's sexual harassment. Indeed, they were not the worst offenders, but where supervisors participate in the creation of a web of clear sexual harassment, the court need not sort out how many of the strands are attributable to the supervisors.

Ultimately, we leave for another day the question of whether strict liability is appropriate in this situation. The record is insufficiently developed for a complete assessment of Callaghan and Partee's supervisory roles. And as discussed below, Phelan has produced sufficient evidence to defeat summary judgment under a negligence theory.

### 2. Negligent Liability for Sexual Harassment

Phelan's sexual harassment claims should have survived summary judgment under a negligence theory. Under such a theory, Phelan can defeat summary judgment by introducing "competent evidence that [her employer] was negligent either in discovering or remedying the harassment directed at her." *Rhodes*, 359 F.3d at 506.

With regard to remedying the harassment, the district court ruled that Phelan's hostile work environment claim could not succeed because "[t]he evidence presented shows that Cook County upheld its legal duty to investigate and take remedial actions when presented with allegations of sexual harassment." *Phelan v. Cook County, et al.*, No. 01-C-3638, 2004 WL 2390084, at *6 (N.D. Ill. Oct. 22, 2004). The court concluded that Phelan's failure to file a formal complaint regarding the harassment she experienced at the CORE Center negated the defendants' burden to demonstrate that it had taken appropriate remedial measures. In arriving at this conclusion, the court misapplied the Supreme Court's ruling in *Faragher*, which dictates that a

hostile work environment defendant can raise an affirmative defense when no tangible employment action is taken. *Faragher*, 524 U.S. at 807. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

We find that the district court erred in applying the *Faragher* defense here because, as discussed above, Phelan's termination constituted an adverse employment action. *See id.* at 808 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.").[5] Nevertheless, the defendants argue that the harassment in the Powerhouse and the harassment in the CORE Center represent two distinct sets of events, one of which was adequately remedied (by the transfer to the CORE Center). As to the harassment that occurred after the transfer to the CORE Center, defendants argue that Phelan has not produced sufficient evidence to present a question of material fact as to whether Cook County was negligent in discovering this harassment.

First, we cannot accept defendants' argument that we should focus only on the harassment that took place after

---

[5] In this circuit, we have generally used the terms "adverse employment action" and "tangible employment action" interchangeably. *See, e.g.*, *Herrnreiter*, 315 F.3d at 744 ("The cases paraphrase this either as 'a tangible employment action,' . . . or as a 'materially adverse employment action'); *but see Lutkewitte v. Gonzales*, 436 F.3d 238, 262 (D.C. Cir. 2006) (discussing conflict among the circuits as to whether these terms are interchangeable). This opinion does not draw a distinction between the two terms.

Phelan's transfer to the CORE Center. The district court observed that "Cook County, for the purpose of summary judgment, does not deny that Phelan was sexually harassed in her original assignment. However, Cook County contends that it took remedial actions by removing Phelan from the original hostile work environment and that it did not have sufficient notice of the recent incidents of sexual harassment." *Phelan*, 2004 WL 2390084, at *4. After making this observation, the district court went on to assess whether the transfer to the CORE Center constituted an adverse employment action, and then, finding no adverse employment action, only examined the defendants' activities at the CORE Center.

The transfer to the CORE Center did not make irrelevant the harassment that occurred in the boiler room. The question regarding remedial steps taken by Cook County is whether it took steps to stop the harassing activity as a whole; the transfer to the CORE Center is simply one measure taken by the defendants in an arguable attempt to stop the harassment. The district court split the hostile work environment issue into two inquiries, and then concluded that the inquiry regarding the boiler room harassment was sufficiently answered by the fact that Cook County transferred Phelan to the CORE Center. Phelan presented substantial evidence that she was subjected to harassing language and physical contact in the boiler room. A question of fact remained as to whether the transfer to the CORE Center constituted a sufficient remedial measure, particularly since there was substantial evidence that the harassment continued in the CORE Center.

Even looking at Phelan's time at the CORE Center in a vacuum, there is sufficient evidence for Phelan's hostile work environment claim to survive summary judgment. Phelan produced evidence that Silva had repeatedly placed her in a headlock, as well as evidence that he, along

with other co-workers, had subjected her to extensive, gender-related, verbal abuse, including statements that she needed to perform various sexual acts to appease her co-workers. The record also contains evidence that Phelan complained about this abuse to her superiors to no avail. All of this goes far beyond the situations in other cases in which we have concluded that the plaintiff produced sufficient evidence to defeat summary judgment. *See, e.g.*, *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798 (7th Cir. 2000) (reversing grant of summary judgment where plaintiff's co-worker forcibly kissed her and attempted to remove her bra).

In granting summary judgment for defendants, the district court relied exclusively on the fact that Phelan did not file a formal complaint after the events in the CORE Center. We find, however, that Phelan was not required to file a formal complaint regarding the harassment in the CORE Center. It is undisputed that Phelan filed a formal complaint regarding the harassment that she experienced in the boiler room, and Phelan offered evidence that, after the problem was not solved by her transfer to the CORE Center, she verbally complained to her supervisors and to Cook County's Human Resources Department.

This is a very different situation from that of the plaintiff in *Durkin*, cited by the district court, where we stated "[a]n employer is not liable for co-employee sexual harassment when a mechanism to report the harassment exists, but the victim fails to utilize it." *Durkin*, 341 F.3d at 612-13. In *Durkin*, the plaintiff had made no attempt to utilize the City's system for handling complaints of sexual harassment, which would have required her to simply make a verbal complaint to her homeroom instructor (the plaintiff was a Chicago Police Department trainee officer). *Id.* In that case, the plaintiff's verbal complaints to others within the Department were too vague to put the City on notice, but

we noted that "there could be instances where this approach is sufficient to put an employer on notice," even where the verbal complaints did not follow the letter of the harassment policy. *Id.* Phelan's situation is precisely the instance we alluded to in *Durkin*, where complaints that do not technically comply with the company's internal procedure are nonetheless sufficient—Cook County cannot reasonably claim that it did not have sufficient notice of Phelan's harassment where she continually complained of physical and verbal abuse in both of her work stations and various employees were witness to such harassment.[6]

Because an issue of material fact remains on the question of Cook County's negligence in discovering and remedying Phelan's co-worker harassment, we reverse the grant of summary judgment on Phelan's hostile work environment claim.

### E.  Race Discrimination

We affirm the district court's grant of summary judgment in favor of the defendants on Phelan's Title VII race discrimination claim. Phelan's race discrimination claim is entirely based on her allegations that Partee and Giles made offensive references to her race during the meeting which culminated in her transfer to the CORE Center. Specifically, Phelan alleges that Partee and Giles referred to her as a "stupid white woman" during the meeting in which her CORE Center transfer was finalized. These statements are localized around the CORE Center transfer,

---

[6]  This point is underscored by the district court's recitation of the facts in its opinion granting summary judgment, where the court stated that, after Phelan had been transferred to the CORE Center, "[a]t one point, Callaghan called HR and informed Broussard that Phelan had been crying because the men were yelling at her." *Phelan*, 2004 WL 2390084, at *2.

and Phelan based her opposition to the motion for summary judgment on the argument that these statements are direct evidence of discriminatory animus in the transfer decision. Because Phelan has not established, and indeed does not continue to argue on appeal, that the transfer to the CORE Center constituted an actionable adverse employment action, summary judgment was appropriate. The statements made by Partee and Giles are temporally disconnected from the broader web of sex discrimination that creates a material question of fact with regard to Phelan's gender discrimination claim, and thus cannot be rationally connected to the adverse employment action in this case—Phelan's termination.

## F.   Retaliation—Title VII

Phelan also argues that the district court erred in granting summary judgment in favor of the defendants on her Title VII retaliation claim. We agree. The Supreme Court recently addressed Title VII's retaliation provision and concluded that the range of conduct prohibited under this provision is broader than Title VII's discrimination provision. *See White*, 126 S. Ct. at 2414. The Court held that in order to sustain a claim of retaliation in violation of Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Id.* at 2415. Pursuant to *White*, Phelan was protected from any "materially adverse" action on the part of her employer designed to deter Phelan from engaging in protected activity. *See id.* But we have already explained that Phelan's termination was actionable under the narrower discrimination provision of Title VII. The question, then, with regard to her Title VII retaliation claim, was whether Phelan had produced sufficient evidence to defeat summary judgment on the question of retaliatory motive. The district court applied the wrong standard in concluding that Phelan

had not established a causal link between her complaints of sexual harassment in July and August 1999 and her termination in October 2000. This conclusion was based exclusively on the amount of time that elapsed between the protected activity and the materially adverse action.

We jettisoned the "causal link" analysis in favor of a two-method system of assessing Title VII retaliation claims, described in our decision in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002). *See Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2006) ("in *Stone v. City of Indianapolis Pub. Util. Div.*, in an opinion that was circulated under Rule 40(e), we held that plaintiffs seeking to prove retaliation under the indirect method need not show 'even an attenuated causal link.' "). Under the first method, a plaintiff can defeat summary judgment by "present[ing] direct evidence . . . that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains."[7] *Stone*, 281 F.3d at 644. "If [the evidence] is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive." *Id.* In the absence of an admission of retaliatory motive by the defendant, a plaintiff can succeed under this first method, referred to as the "direct method," by presenting sufficient circumstantial evidence such that a jury could infer retaliation. *See Culver v. Gorman & Co.*, 416 F.3d 540,

---

[7] That *Stone* uses the term "adverse employment action" in this context, as opposed to the term "materially adverse action," used by the Supreme Court in *White*, is irrelevant. *Stone* addresses the proper test for determining whether there is sufficient evidence of retaliatory motive, and this analysis is unaltered by *White*. Going forward, of course, a court adjudicating a retaliation claim on summary judgment must ask whether a reasonable employee would have found the challenged action "materially adverse."

546 (2005). The second method described in *Stone*, known as the "indirect method," "requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action." *Stone*, 281 F.3d at 644. Only the direct method is relevant to our inquiry here.

In *Culver*, we concluded that the plaintiff could succeed under the direct method in part because she produced evidence that she had received favorable performance reviews shortly before her firing, and also because she alleged her immediate supervisor attempted to dissuade her from complaining to higher-ups about the supervisor's discriminatory actions. 416 F.3d at 546-47. Like the *Culver* plaintiff, Phelan introduced evidence that her termination was inconsistent with her satisfactory performance of her job shortly before termination. Cook County's finding upon reinstating Phelan was that she had made a good faith effort to appropriately utilize the company's leave policy. Phelan also introduced evidence that her immediate supervisor attempted to discourage her from complaining about sexual harassment and failed to report her final complaints to Human Resources. The record is replete with the warnings of various employees that Phelan would experience adverse consequences if she continued to complain about her harassment. Phelan testified at her deposition that her immediate supervisor, Jack Callaghan, threatened to terminate her if she continued to complain about sexual harassment. The time between Phelan's protected activity and her termination is not as short as the plaintiff in *Culver*, where only 72 hours passed between the plaintiff's protected activity and her termination. But it is sufficiently short to create a triable issue of fact. Phelan's attorney contacted Cook County regarding the sexual harassment directed at Phelan on June 30, 2000, and Phelan filed her related leave request in August. Cook County initiated the process to terminate her the following

month, when it sent her a letter notifying her of the forthcoming disciplinary hearing. A reasonable fact finder, viewing the passage of time in the context of the other evidence of discriminatory retaliation, could conclude that Phelan's termination was a prohibited act of retaliation.

## G.  Section 1983 Claims

The district court offered two reasons for granting summary judgment in favor of the defendants on Phelan's Section 1983 claims against Cook County: (1) Cook County had sufficiently demonstrated that it is intolerant of acts of sexual harassment through its sexual harassment policy; and (2) Cook County had sufficiently responded in investigating Phelan's original complaint and in attempting to transfer her to a less hostile work environment. *Phelan*, 2004 WL 2390084, at *9. The district court concluded that Phelan's Section 1983 claims against the individual defendants and her Section 1983 claims against Cook County merge, and the parties do not contest this conclusion on appeal. Thus, we also treat the claims as merged and examine the sexual harassment and retaliation claims separately.

### 1.  Sexual Harassment

The defendants challenge Phelan's Section 1983 sexual harassment claim against Cook County, contending that Phelan cannot present evidence establishing that a person with final policy-making authority caused or ratified any harassment. They further argue that Phelan cannot demonstrate that the harassment she suffered was part of a widespread practice. Municipal entities cannot be held vicariously liable for the acts of their employees under Section 1983 on a *respondeat superior* theory. *See Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992) (citing

*Monell v. New York Department of Social Services*, 436 U.S. 658 (1978)). To establish liability, Phelan must produce evidence of "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997).

Phelan focuses on the second means of establishing *Monell* liability, arguing that the evidence of knowledge and condoning of her harassment on the part of various supervisory officials demonstrates the existence of a widespread practice constituting custom or usage. "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *see also Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995) ("The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers."). Phelan does not present what might be considered the prototypical situation of a "widespread practice" argument, which would focus on the application of the policy to many different individuals, but rather attempts to show that the many actions directed at her evince widespread practice. She raises the question of whether a reasonable jury could infer the existence of a policy through repeated actions directed at one person.

Cook County implicitly argued that this question must be answered in the negative when it asserted, in its motion for

summary judgment, that Phelan had failed to "identif[y] any comparable cases within Cook County d/b/a Cook County Hospital which would allow for the conclusion that there was a widespread practice of harassment based on sex." The rule urged by Cook County seems to impose a potentially unreasonable burden on a plaintiff like Phelan. The record reflects that there were almost no women working in a similar capacity to Phelan or in her department;[8] Phelan's supervisor, John Callaghan, testified that in the twelve years that he had been in charge of the department, Phelan was the only woman to work under him as a mechanical assistant. In such a situation, identifying numerous individuals who have received treatment similar to the plaintiff is impossible. Yet this is potentially the situation in which there is the greatest likelihood that a plaintiff will be subject to actionable discrimination.

Generally speaking, we do not believe that a plaintiff should be foreclosed from pursuing Section 1983 claims where she can demonstrate that repeated actions directed at her truly evince the existence of a policy. But we are mindful of the Supreme Court's admonition that "the word 'policy' generally implies a course of action consciously chosen from among various alternatives." *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). In a similar vein, we have observed that "[b]oth in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event." *Calhoun*, 408 F.3d at 380. Thus, we have declined to find that an alleged widespread practice could evince a true municipal policy where the plaintiff introduced evidence that on three separate occasions prison

---

[8] The record reflects that one other woman worked in the Buildings and Grounds Department during the relevant time period, out of 150 employees.

guards improperly sprayed inmates with pepper spray. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) ("these incidents do not amount to 'a widespread practice' that is 'permanent and well settled' so as to constitute an unconstitutional custom or policy about which the sheriff was deliberately indifferent"). Similarly, we rejected a plaintiff's attempt to demonstrate a widespread practice amounting to a policy where the plaintiff introduced evidence of two situations in which the prison had placed black inmates in "gladiator cell blocks" that posed a threat to their safety. *See Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). The unifying theme in these decisions is the acknowledgment that the word "widespread" must be taken seriously. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.

Phelan falls short of this mark. Although she has presented evidence that multiple Cook County employees subjected her to sexual harassment and gender discrimination, she has failed to weave these separate incidents together into a cognizable policy. The incidents in this case are insufficient to conclude that the practice of ignoring sexual harassment had the "permanent and well-settled" quality required by our precedents. *See Roach*, 111 F.3d at 548. Thus, we affirm the district court's grant of summary judgment to the defendants on Phelan's Section 1983 sexual harassment claim.

### 2. Retaliation

The defendants also argue that Phelan's Section 1983 retaliation claim fails because Phelan's protests regarding

her harassment do not speak to matters of public concern. A Section 1983 claim that alleges the defendants retaliated in response to the plaintiff's proper exercise of her First Amendment rights must satisfy a three-step test in order to survive summary judgment. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). The first step in that test is assessing whether the plaintiff's speech is constitutionally protected. *Id.* Next, the court must assess whether the plaintiff has demonstrated that the alleged retaliatory activity was motivated by the constitutionally protected speech. *Id.* Finally, if the plaintiff satisfies the first two steps, the court must assess whether the defendant has demonstrated that it would have taken the same action irrespective of the plaintiff's speech. *Id.* The defendants argue that Phelan cannot pass the first step.

To determine whether Phelan's speech is constitutionally protected, we must employ the two-part test derived from the Supreme Court's rulings in *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Bd. of Educ. of Twp. High School Dist. 205*, 391 U.S. 563, 568 (1968). *See Wernsing v. Thompson*, 423 F.3d 732, 750 (7th Cir. 2005). The first part of the *Connick-Pickering* test requires the court to determine whether Phelan's speech addressed a matter of public concern. *Connick*, 461 U.S. at 147-48; *Wernsing*, 423 F.3d at 751.

In *Connick*, the Supreme Court found that a terminated assistant district attorney's expressive activity did not involve a matter of public concern where she disseminated a questionnaire to her co-workers soliciting their views on office morale and dynamics, including whether they felt pressure to work in political campaigns. *See Connick*, 461 U.S. at 141. The Court ruled that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in

which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147. The Court further held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. In *Kokkinis*, this court, applying *Connick*, held that while "[t]he issue of sex discrimination in public employment is, of course, a matter of public concern," the plaintiff, a police officer who criticized the Police Chief's record on sex discrimination on a local television news show, was not speaking on a matter of public concern because the record reflected that he "had a limited interest in speaking on the subject of sex discrimination within the police department." *See Kokkinis*, 185 F.3d at 844.

Here, we conclude that Phelan's speech does not address a matter of public concern. "The fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern." *Button v. Kibby Brown*, 146 F.3d 529, 529 (7th Cir. 1998). However, "speech lacks the public concern element if it concerns a subject of public interest but the expression addresses only the personal effect upon the employee." *Id.* at 529-30 (internal citation and quotation marks omitted). Phelan has not alleged or introduced evidence supporting a conclusion that she expressed concerns about sexual harassment beyond concerns specifically related to her treatment at Cook County. She argues only that her complaints regarding harassment at Cook County were also intended to vindicate the rights of the one other woman who worked in the Buildings and Grounds Department. This additional motivation of Phelan's, while laudable, is insufficient to meet the public concern requirement. The "content, form and context" of Phelan's complaints reveal that her purpose was to advance her personal

interests. *See Connick*, 461 U.S. at 147-48. There is no evidence in the record that she complained about the treatment of the other woman in the Buildings and Grounds Department at any point. Nor is there any evidence that she attempted to bring her situation to the attention of anyone other than the parties that were in a position to remedy her personal situation. *See Button*, 146 F.3d at 531. Thus, we affirm the district court's grant of summary judgment with regard to Phelan's Section 1983 retaliation claim.

### III. CONCLUSION

This matter is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*