[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 3, 2008
THOMAS K. KAHN
CLERK

No. 07-11603

D.C. Docket No. 04-00089-CV-JOF-1

JACQUELYN R. CRAWFORD,

                                        Plaintiff-Appellant,

versus

BARBARA CARROLL,
KATHERINE JOHNSTON,
individually and in her official capacity as Vice President
of Finance and Administration,
BOARD OF REGENTS OF THE UNIVERSITY SYSTEM
OF GEORGIA/GEORGIA STATE UNIVERSITY,

                                        Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Georgia

**(June 3, 2008)**

Before BIRCH and FAY, Circuit Judges, and RODGERS,* District Judge.

* Honorable Margaret C. Rodgers, United States District Judge for the Northern District of
Florida, sitting by designation.

RODGERS, District Judge:

Jacquelyn R. Crawford appeals the district court's grant of summary judgment in favor of her former employer, the Board of Regents of the University System of Georgia/Georgia State University (GSU), and two of her former supervisors, GSU officers Barbara Carroll and Katherine Johnston. After review and oral argument, we reverse and remand for further proceedings, having determined that genuine issues of material fact exist that preclude summary judgment on Crawford's Title VII retaliation and race discrimination claims against GSU and her 42 U.S.C. § 1983 race discrimination claim against Carroll. We affirm the district court's grant of summary judgment to Johnston on Crawford's § 1983 race discrimination claim because Johnston is entitled to qualified immunity.

## I. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1161-62 (11th Cir. 2006). At summary judgment we consider all evidence and reasonable factual inferences drawn therefrom in a light most favorable to the non-moving party. *Rojas v. Fla. Dep't of Bus. & Prof'l Regulations Pari-Mutual*, 285 F.3d 1339, 1341-42 (11th Cir. 2002) (*per curiam*) (citation and quotations omitted).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Wilson v. B/E/ Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).

## II. Background[1]

Crawford, who is African-American, began working in the personnel field in 1987. She holds a masters degree in public administration, with a specialization in human resources management. In 1992 GSU hired Crawford to serve as the wage and salary administrator in its human resources department. Crawford was promoted in December 1997 to the position of manager of classification and compensation, her job at the time the events giving rise to this case occurred. Carroll was GSU's assistant vice president of human resources from March 1999 until August 2004. She supervised Crawford's position as well the higher level positions of director of human resources, director of human resources information systems, and director of payroll. Johnston came to GSU in July 2000 to serve as

---

[1] At summary judgment we view the facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). We therefore do so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, we observe that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts nor are all of the facts. *See Montount v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

its vice president of finance and administration. In that capacity she directly supervised Carroll. Johnston was also responsible for overseeing the supervision of approximately eight hundred other GSU employees, including those in the human resources, budget, physical plant, facilities planning, campus master planning, and campus police departments. Both Carroll and Johnston are Caucasian.

In early 2000 Crawford was absent from work periodically due to her mother's serious illness; her mother died in February 2000. In March 2000 Carroll formally reprimanded Crawford for misuse of the department's leave policy, in particular its bereavement leave policy which Carroll stated permitted only up to three days' absence in connection with the death of a family member. Carroll asserted that Crawford had missed eighteen full or partial days of work prior to and following her mother's death without giving proper notice or obtaining proper authorization. In response, Crawford filed a grievance in which she protested that the reprimand was factually incorrect as well as culturally insensitive. According to Crawford, Carroll did not understand that the funeral practices of African-Americans require more than three days of leave. When Carroll failed to withdraw the reprimand Crawford appealed to GSU's provost and vice president for academic affairs, who reversed the reprimand and instructed that it be removed

4

from Crawford's file, partly on the ground it contained errors of fact. Crawford maintains that subsequent to the reversal of the reprimand Carroll took retaliatory action against her by making new and unreasonable job demands and by sending her an increased number of e-mail messages, many of which Crawford felt were unfairly critical of her work performance.

In April 2001 Crawford wrote to Carroll to make staffing recommendations for the classification and compensation division. Additionally, based on her own analysis of internal and external market data, Crawford asked Carroll to increase her annual salary of $50,960 to the range of $54,565 to $56,202 in order to be commensurate with other positions of similar responsibility. Carroll responded that she would not address Crawford's requests until a new position, that of director of classification and employment, had been filled. This position would be responsible for supervising classification division functions, *i.e.*, those performed by Crawford's department such as assigning pay classifications and developing job descriptions, as well as functions related to the employment division, such as posting vacant positions and accepting and reviewing job applications. Crawford thought she was eligible to receive an "in-place" promotion to the new position because other employees had been given promotions in similar circumstances but the job was not offered to her; instead, the position was advertised in August

2001.[2]

A five-member panel comprised of GSU management and staff was formed to screen the applicants for the new position and recommend a candidate to Johnston, who would interview the candidate.[3] Johnston, with the approval of Linda Nelson – the director of GSU's Office of Affirmative Action and Diversity Programs (OAADP) – would then make the final selection. Crawford applied for the new job and was chosen for an interview. It was conducted by Carroll and the other panel members in the early fall of 2001.

Carroll favored hiring Nancy Strasner, a Caucasian female, for the new position. Mae Okwandu, an Equal Opportunity specialist at GSU who reviewed the qualifications of the applicants during the selection process, felt that Crawford was the most qualified applicant. Nelson thought Crawford's and Strasner's qualifications were "somewhat equal," with Crawford having greater experience in the compensation field and less in the employment area, and Strasner's experience

---

[2] An "in place" promotion is one that results from an employee's being reclassified in job title and salary without posting the new position for competitive recruitment. In this appeal Crawford does not challenge the district court's holding that her claim of being wrongly denied an "in-place" promotion is time-barred.

[3] Carroll served on the panel, as did two human resources department directors, Melissa Brennaman (the director of human resources for information systems) and Dawn Davis (the director of payroll). Brennaman and Davis are Caucasian. Additionally, employees Sonya Richburg and Paula Gomes, both of whom are African-American, were panel members.

being the reverse. Ultimately, Nelson described Crawford as the "best suited" candidate and slightly preferred her because she was already employed by GSU and was familiar with its operations. Johnston testified that she interviewed Strasner, at Carroll's request, but thought Strasner lacked sufficient experience and therefore – to Carroll's displeasure – declined to endorse Strasner for the job. No other candidates were proposed to her so Johnston interviewed none.

In December 2001 Crawford filed an internal complaint of retaliation with the OAADP. In the complaint Crawford alleged that Carroll had subjected her to increased, unfair scrutiny of her job performance and mishandled the recruitment process for the new position of director of classification and employment.

In January 2002 Nelson issued a determination letter announcing that there had been no consensus reached regarding whom to hire for the new position and that the job therefore would not be filled at that time. No other reason was given. In a deposition Nelson stated that Johnston told her that she did not wish to hire anyone given Nelson's view that Crawford rather than Strasner was the best suited candidate, Nelson's concern there was no real need for the new position, and her concern over "other incidents in the past."[4] When asked to identify the past

---

[4] Crawford maintains this is a reference to her prior complaint of discriminatory treatment regarding her bereavement leave.

incidents, Nelson responded, "[s]ome of the issues that Ms. Crawford brought up regarding communication that occurred between Ms. Carroll and Ms. Crawford and, you know, those types of things." With the new position unfilled, Carroll temporarily assigned some of its duties to Brennaman, who had been employed at GSU for approximately twenty years and was then earning a salary of approximately $70,000 per year.

In January or February 2002 the position of director of classification and employment was posted for a second time. Crawford again applied but no applicants were selected for interviews.[5]

In April 2002 Carroll wrote, and Johnston approved, a negative evaluation of Crawford's job performance for the period from March 2001 through March 2002. Crawford learned in May 2002 that as a result of the poor evaluation she would not be eligible to receive a merit pay increase due in October 2002.

In May 2002 Crawford submitted a complaint to Johnston alleging that Carroll had retaliated and discriminated against her. Among other matters, Crawford's complaint addressed Carroll's negative performance review (and Crawford's resulting loss of eligibility for a merit pay increase), Crawford's

---

[5] The record is unclear as to whether, in addition to Crawford, there were any other applicants for the position at this time. Crawford understood that no interviews were conducted because the process had stalled, but she was unaware of the specific reasons for the inaction.

contention that she suffered racially disparate treatment in the terms and conditions of her employment compared with Brennaman and others, and Crawford's nonselection for the new position of director of classification and employment. Johnston met with Crawford in July 2002 for approximately forty-five minutes to discuss the complaint, then later denied it. According to Johnston, she viewed the tension between Crawford and Carroll as essentially a serious personality conflict between two strong-minded women with major disagreements over how the human resources department's work should be performed. As Johnston "was not convinced that [the problems were related to] discrimination and retaliation," she simply counseled Crawford to work towards improving her relationship with Carroll. Johnston also testified that she took no independent action regarding Crawford's allegations because Johnston believed the claims were being investigated independently by the OAADP. Crawford contends Johnston was hostile during their meeting, accusing her of having an attitude problem, being to blame for the friction between Carroll and herself, and accepting Carroll's version of events without addressing Crawford's concerns.

Crawford appealed Johnston's denial of her complaint to GSU president Carl Patton. Crawford also filed a complaint with the OAADP, which hired independent investigator Arthur Rogers to conduct an inquiry into Crawford's

9

allegations. Rogers submitted a final report in October 2002 in which he recommended that "a cause determination be issued indicating a violation of Title VII occurred in regards to race, and retaliation as they pertain to evaluation merit pay, promotion opportunity and disparate treatment."[6] Nelson accepted Rogers' findings and referred Crawford to Johnson for follow-up. Additionally, although the OAADP did not itself formally investigate Crawford's complaints, the issues her complaints raised were discussed internally within the OAADP by Nelson and her staff, as well as with Johnston and perhaps the provost. Nelson concluded there were Causasian employees in the human resources department, namely Brennaman and another worker, Angela Bourque, who had been moved forward at a faster pace than had African-American employees.

In September 2002 Crawford wrote to Patton again regarding the appeal of her complaint. She requested that she be given a four percent merit increase in salary, that the requirements of her position be outlined in a detailed job description, and that the classification and compensation division be assigned an additional analyst because it was understaffed. Patton responded that a "desk audit" of plaintiff's position, salary, and responsibilities would be performed and

---

[6] This was the second draft of Rogers' report. Crawford contends that Nelson asked Rogers to rewrite his report because she found the first one to be excessively critical of the human resources department.

that if changes were warranted they would be made.

In October 2002 Carroll posted the new position of director of classification and employment for a third time. Johnston wished to broaden the pool of those engaged in the selection process, so Carroll established a four-member screening committee to evaluate the applicants. The committee consisted of two individuals from GSU's finance and administration division, one from an academic division on campus, and one from a non-academic division. First, a recruiter in the employment office reviewed the résumés of the one hundred ten applicants, narrowing the field to fifty-four candidates, including Crawford. Next, the four screening committee reviewers individually listed the five to eight applicants each thought should be interviewed. After briefly consulting with Johnston, Carroll decided to limit the group of interviewees to the three candidates whom three of the panelists had chosen. Carroll did not inform Johnston of the names of those selected for interviews but rather simply the result of the method employed. Crawford was selected by only two of the screening committee members and thus was not among those included in the final group of three. Two of these candidates agreed to be interviewed for the position, with the committee ultimately recommending that Russell Willis, a Caucasian male, receive the position over the other finalist, an African-American female.

In December 2002 Crawford filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). She identified race as the basis of her charge and claimed a starting date in May 2002, which is when she learned she would be denied a merit pay increase. In January 2003 Crawford submitted a written protest to Nelson regarding the selection process for the new position and complaining of continued acts of race discrimination and retaliation by Carroll. In February 2003 Carroll recommended that Willis be offered the position of director of classification and employment. No offer was made to Willis, however, based on Nelson's advice against filling the position while Crawford's race discrimination claims were pending. Crawford amended her EEOC charge in April 2003 to include race discrimination and retaliation based on her nonselection for the new position of director of classification and employment.

In accordance with Patton's instruction, and as recommended by Johnston, an outside consultant was hired to perform a functional assessment of the office of human resources in January 2003. The consultant, Whit Perrin Wright, completed her "desk audit" in March 2003. Wright observed that most universities do not combine the functions of employment and classification in one job, as GSU had. She also indicated that the duties of the new position could instead be handled by other human resources department staff. Wright further noted that Brennaman's

12

position as director of human resources for information systems did not involve as much responsibility as other directors' positions did; her job also appeared to be no greater in depth or scope to a manager's position and did not require that any other employees directly report to her. Wright recommended that the human resources department have a clearer definition of the criteria used to determine titles, pay bands, and pay grades. She also commented that Crawford's position, with a salary of $50,960, seemed to be paid approximately $4000 below the benchmark for manager-level jobs, while at $73,901 Brennaman's director-level job was paid at the median or average level.

In March 2003 Johnston decided to adjust Crawford's pay grade and increase her salary to $54,740 annually. Johnston also eliminated the new position of director of employment and classification; according to Johnston, due to budget constraints, she was under enormous pressure to reduce expenditures in the departments under her supervision. Relying on Nelson's advice as well as Wright's report, Johnston determined that the new position could be abolished without "hurting the organization." Later that month Johnston was relieved of responsibility for supervising the human resources department. In October 2003, Jerry Rackliffe, who had assumed Johnston's duties, advised Crawford by letter that based on Wright's review her position had been reclassified from a pay grade

17 to a pay grade 18, with a salary adjustment to $54,740 annually. Rackliffe also advised Crawford that "[a]s an action to settle your complaint regarding your 2002 Performance Evaluation, we have retroactively adjusted your salary by 4% on top of your classification adjustment. Thus, this adjustment will move your base salary to $56,930, retroactive to October 1, 2002." In 2004 Crawford was promoted to the position of assistant director of human resources, with a salary of $70,000 per year.

Crawford filed this suit in January 2004, asserting claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. The magistrate judge to whom the case was referred recommended the defendants' motion for summary judgment be granted in part and denied in part. The district court modified and adopted the magistrate judge's report, granting the defendants' motion for summary judgment in its entirety and dismissing the complaint with prejudice.[7] This appeal followed.

---

[7] The magistrate judge recommended dismissal of the following claims in Crawford's three-count complaint because Crawford had abandoned them: Title VII claims against Johnston and Carroll for racial discrimination and retaliation; § 1981 claims against all defendants for racial discrimination and retaliation; § 1983 claims against GSU for racial discrimination; and §1983 claims for retaliation against GSU and Johnston and Carroll in their individual capacities. With respect to the remaining claims, the magistrate judge recommended granting the motion on Crawford's Title VII discrimination and retaliation claims against GSU and her § 1983 discrimination claim against Johnston in her individual capacity. He recommended denying the motion on Crawford's §1983 discrimination claim against Carroll in her individual capacity. The district court accepted the magistrate judge's recommendations of dismissal but also dismissed

14

# III. Discussion

The district court addressed Crawford's race discrimination and retaliation claims together in connection with three events: "(1) denial of a merit increase in October 2002, (2) discrepancy in pay and responsibilities between Plaintiff and Melissa Brennaman, and (3) denial of promotion to [d]irector, [c]lassification and [e]mployment . . . . " For ease of discussion we do much the same.[8]

## A. Denial of Merit Pay Increase

Crawford claims that her April 2002 performance evaluation was retaliatory and racially discriminatory and resulted in her being denied a merit pay increase she otherwise would have received. With respect to this claim, the parties' arguments, and the district court's analysis, center on whether Crawford presented a *prima facie* case of discrimination or retaliation by showing she suffered an adverse employment action.[9]

the § 1983 claim against Carroll.

[8] Crawford specifically limits her appeal to the "Merits section of the District Court's Order, which begins on Page 10 of the Order." App. Brief at 25. Thus Crawford appeals only the district court's rulings on her claims arising from these three events.

[9] In discussing Crawford's allegations that she was denied a merit pay increase, the district court states that Crawford "was notified on March 12, 2003, that her salary would be retroactively increased four percent from May 6, 2002. The question then becomes whether Plaintiff has suffered an adverse employment action because of the time period between May 6, 2002, and March 12, 2003, when she did not have her increase in salary." Under the district

To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably. *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (*per curiam*). These elements also apply to a claim of race discrimination under § 1983 because the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same. *See Abel v. Dubberly*, 210 F.3d 1334, 1338 (11th Cir. 2000) (holding that Title VII and § 1983

court's calculation, Crawford therefore was denied a merit pay increase for approximately ten months, even though she was not due to receive the increase until October 2002.

Our review of the voluminous record in this case reveals only that Johnston decided on March 13, 2003, to adjust Crawford's pay grade and increase her salary to $54,740 annually. We did not locate a reference to the four percent merit pay increase being awarded in March 2003. Rather, insofar as we have been able to determine, the merit pay increase was not awarded until October 2003, retroactive to October 2002. If these calculations are correct, Crawford actually went without a merit pay increase for approximately twelve months – from October 2002 until October 2003 – even though the increase was eventually paid retroactively. Crawford was also aware of her ineligibility to receive the merit pay increase in May 2002, a period of another five months. Additionally, if it is assumed that Crawford was entitled to a pay grade and salary adjustment in April 2001, when she wrote Carroll requesting an increase, Crawford went without a pay grade adjustment for approximately twenty-three months (this increase apparently was first awarded in March 2003 by Johnston, then directed in October 2003 by Rackliffe to be paid retroactively to October 2002).

Fortunately, it is not necessary for us to know the precise number of months involved with respect to either the denial of the merit pay increase or the pay grade adjustment, which is relevant to Crawford's disparate pay claim. The parties do not dispute the ten month period identified by the district court. In any event, recognizing that a significant period of time was involved, perhaps anywhere from five to twenty-three months for each event, is sufficient for the purpose of our analysis here.

16

claims have the same elements where the claims are based on the same set of facts); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (stating that "[w]here, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical . . . [and] we need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims.").

Title VII also prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e-3(a). A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

In the past this circuit's standard for both discrimination and retaliation claims has required an employee to establish an "ultimate employment decision" or make some other showing of substantiality in the employment context in order to establish an adverse employment action. *See Stavropoulos v. Firestone*, 361

F.3d 610, 616-17 (11th Cir. 2004);  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000);  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  We defined ultimate employment decisions as those "such as termination, failure to hire, or demotion."  *Stavropoulos*, 361 F.3d at 617.  And we required that conduct falling short of an ultimate employment decision must, in some substantial way, "alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect[ ] his or her status as an employee."  *Gupta*, 212 F.3d at 587 (quotation and citation omitted).  More particularly, when defining the level of substantiality required for a Title VII discrimination claim, we required an employee to demonstrate she suffered "a *serious and material* change in the terms, conditions, or privileges of employment" to show an adverse employment action. *Davis*, 245 F.3d at 1239 (emphasis added).   The "serious and material change" requirement has also been applied in this circuit to Title VII retaliation claims.[10] *See, e.g.,  Stavropoulos*, 361 F.3d at 617;  *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001);  *Gupta*, 212 F.3d at

---

[10]  *Davis* also refers to a "materially adverse change"requirement, 245 F.3d at 1239, while *Stavropoulos* and *Gupta* require proof of "serious and tangible" act. *Stavropoulos*, 361 F.3d at 616-17; *Gupta*, 212 F.3d at 587.  Regardless of the different terminology used, the applicable standard appears to be the same.

588;  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998);

*Benefield v. Fulton Co., Ga.*, 130 Fed.Appx. 308 (11th Cir. 2005).

The district court in this case found that because GSU had awarded

Crawford a merit pay increase, effective retroactively to October 2002, Crawford

could not establish an adverse employment action for purposes of either her

discrimination or retaliation claims.  According to the district court, because

Crawford's "job was never in doubt, and she never lost any of her base salary,"

she did not suffer a materially adverse employment action in connection with the

denial of her merit pay increase.  The question then is whether the fact that GSU

reversed its decision and awarded Crawford her merit pay increase retroactively

somehow deprives her of the right to pursue her claims.  For the reasons given

below, we think the answer to that question is "no."

We first note that our decision in *Gillis v. Georgia Department of*

*Corrections*, 400 F.3d 883 (11th Cir. 2005*)*, is directly on point on Crawford's

discrimination claims.  The district court recognized the relevance of *Gillis* to the

instant case but declined to apply that decision because it concluded, as it did in

connection with Crawford's retaliation claim, that her successful grievance

resulted in her having suffered no loss and thus no adverse employment action.

In *Gillis* the plaintiff, an African-American female, received a "met

19

expectations" performance evaluation, which resulted in her receiving a three percent raise, rather than an "exceeded expectations" evaluation, which would have yielded a five percent raise. The difference between the three percent raise and the five percent raise was less than $1000 annually, and the plaintiff lost no employment benefits as a result of the evaluation. Gillis brought a Title VII action against her employer and former supervisors. The district court held that Gillis' receiving a smaller pay raise than she would have had her performance evaluation been more favorable did not constitute an adverse employment action and granted summary judgment for the defendants. We reversed the district court's judgment on Gillis' race discrimination claim, holding that a poor performance evaluation that directly results in the denial of a pay raise of any significance clearly affects an employee's compensation and thus constitutes an adverse employment action under Title VII. *Id.* at 888 (citing *Davis*, 245 F.3d at 1240; *McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir. 1994); and *Gupta*, 212 F.3d at 590).

We perceive no basis for distinguishing the facts of the instant case from those in *Gillis*. As was true for the plaintiff in *Gillis*, the evidence in this case shows that Crawford's poor evaluation and her compensation were "inextricably intertwined." *Id.* at 888. From October 2002 (when Crawford's paycheck did not include the four percent merit pay increase she otherwise would have received

absent the poor evaluation she was given in April 2002) until her position was reclassified in March 2003 and salary retroactively increased by four percent in October 2003, Crawford suffered an adverse employment action directly connected to her compensation. Although Crawford received a retroactively awarded merit pay increase, that raise could not alter the fact that she had been denied the increase or erase all injury associated with it, specifically the lost value and use of the funds during the time she was not receiving them. *See Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) (finding, for purposes of plaintiff's VII gender discrimination claim, that a four month job termination constituted an adverse action even though the plaintiff was later reinstated and awarded back pay). To conclude otherwise would permit employers to escape Title VII liability by correcting their discriminatory and retaliatory acts after the fact. *Id.* (stating that "[c]onsistent with Title VII's goal of deterring discrimination, we decline to endorse a rule that would allow employers to escape liability by merely reinstating [an] aggrieved employee months after termination, whenever it becomes clear that the employee intends to pursue her claims in court."). Following the Seventh Circuit's lead, we too decline to hold as a matter of law that a retroactive pay raise can "undo" the harm caused by a discriminatory or retaliatory act because such a decision could permit employers to elude liability

21

for conduct that otherwise is actionable. We therefore find that the district court erred when it held that Crawford's poor performance evaluation, which made her ineligible for a merit pay increase in October 2002, did not constitute an adverse employment action for purposes of her discrimination claims.

The district court relied on our decision in *Stavropoulos v. Firestone*, 361 F.3d 610 (11th Cir. 2004), to analyze Crawford's allegations of retaliation. In that case an untenured college assistant professor claimed she was retaliated against in violation of Title VII when, after she complained about a hiring decision involving another professor, the faculty later twice voted not to renew her teaching contract. On both occasions, after the plaintiff successfully challenged the faculty's votes, her contract was renewed before the prior contract had concluded. We affirmed summary judgment in the defendants' favor, noting first that no ultimate employment decisions were involved because the plaintiff "did not lose her job or suffer a lessening of pay, position, or benefits." *Stavropoulos*, 361 F.3d at 617. We also concluded that the complained-of acts did not rise to a sufficient level of substantiality because they ultimately had no effect on the plaintiff's employment status. Further, we decided that any emotional distress or costs incidental to the plaintiff's seeking review of the votes were too insubstantial to be considered an adverse employment action because the plaintiff's challenges ultimately were

22

successful.  *Id.* at 618.

Our decision in *Stavropoulos* hinged on whether the employer's actions adversely affected the plaintiff's employment status.  *See Stavropoulos*, 361 F.3d at 617 (noting that "[h]ere, the acts Stavropoulos complains of ultimately had no effect on her employment status.").  As previously discussed, the plaintiff in that case suffered no loss in pay or benefits whatsoever as a result of the faculty votes recommending that she not be rehired.  Stavropoulos' contracts in fact were renewed, with no lapse in employment and thus nothing more than an *anticipated* loss.  We thus concluded Stavropoulos suffered no tangible harm as a result of an employment decision that never became final.  *Id.*

We think that on the facts of this case the district court misapplied the standard and the holding of *Stavropoulos*.  In Crawford's case, the decision that she not be awarded a merit pay increase was a final decision that resulted in her not receiving a merit pay increase.  As acknowledged by the district court, "[there is no dispute that as a result of the rating Carroll gave to plaintiff on her 2001-2002 evaluation, Plaintiff did not receive an increase in her salary effective 2002."  Crawford, unlike Stavropoulos, therefore, realized an *actual* loss.  Although the four percent merit pay increase eventually was awarded retroactively in October 2003, as noted, Crawford nevertheless was deprived of the use or value of her

23

merit pay from the time it otherwise would have been awarded in October 2002.

In other words, Crawford suffered an adverse employment action directly related

to her compensation: the alleged retaliatory performance appraisal deprived her of

the tangible employment opportunity of receiving a merit pay increase and thus

adversely affected her status as an employee.[11] Again, we think it important to

emphasize that an employer cannot undo the harm its actions have caused, and

thereby avoid liability, simply by attempting to make the employee whole

retroactively. *See Phelan,* 463 F.3d at 780. This case is not, as the district court

deemed it, simply a matter of "no harm, no foul."

Thus, for the foregoing reasons, with respect to the temporary denial of a

merit pay increase, we conclude that under the standards outlined in *Gillis* and

*Stavropoulos* Crawford showed that she suffered an adverse employment action

for purposes of her race discrimination and retaliation claims. The district court

therefore erred in ruling otherwise.

The district court also discussed but chose not to apply the Supreme Court's

decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct.

2405, 165 L.Ed.2d 345 (2006), in which the Court announced a new rule which

---

[11] The district court incorrectly assumed that Crawford's only injury was "having to await the results of her appeal before retroactively receiving her merit increase."

24

redefines the standard for retaliation claims under Title VII.[12]  For the reasons previously discussed, we are convinced that under this circuit's prior standard the district court erred in granting summary judgment on Crawford's retaliation claim. If any doubt remained regarding the incorrectness of the district court's ruling – though we find none does – application of the decidedly more relaxed *Burlington* standard to the facts of this case must emphatically dispel it.

Under the holding of *Burlington*, the type of employer conduct considered actionable has been broadened from that which adversely effects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related.[13]  *See Burlington*, 126 S.Ct. at 2415.  Thus, the *Burlington* Court effectively rejected the standards applied by this court in both *Stavropoulos* and *Gupta* that required an employee to show either an ultimate employment decision or substantial employment action to establish an adverse

---

[12]  The district court concluded that the facts of Crawford's case were more closely aligned with those in *Stavropoulos* and therefore that *Stavropoulos* should control.  The court found it unnecessary to decide "the extent to which *Burlington Northern* might overrule *Stavropoulos* because the factual circumstances of the two cases differ substantially and the cases, therefore, are distinguishable."

[13] *Burlington* also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered "materially adverse" to him and thus constitute adverse employment actions.  *See Burlington*, 126 S.Ct. at 2417.

employment action for the purpose of a Title VII retaliation claim.[14] *See*

*Burlington*, 126 S.Ct. at 2415; *Stavropoulos*, 361 F.3d at 616-17; *Gupta*, 212

F.3d at 587. Additionally, the Court explained that in the context of a Title VII

retaliation claim, a materially adverse action "means it well might have dissuaded

a reasonable worker from making or supporting a charge of discrimination."

*Burlington*, 126 S.Ct. at 2415.

This more liberal view of what constitutes an adverse employment action

accords an employee protection from a wider range of retaliatory conduct than

would be available under the standard applied in *Stavropoulos* and *Gupta*. *See*

*Phelan*, 463 F.3d at 781, n. 3 (stating that in *Burlington* the Court concluded "the

Title VII retaliation provision protects an employee from a wider range of conduct

than the discrimination provision does."). We therefore are persuaded that the

adverse employment action standard previously applied in this circuit to Title VII

retaliation claims is more stringent than the "materially adverse" standard

---

[14] Thus the district court's observation that *Burlington's* "materially adverse" standard does not conflict with our prior standard, which requires a "serious and material" change in terms, conditions, or privileges of employment, is not correct. The two standards are distinct and different and, as noted, the *Burlington* standard applies to a wider range of employer conduct. It should be noted, however, that while the new standard enunciated in *Burlington* applies to Title VII retaliation claims, it has no application to substantive Title VII discrimination claims; the prior standard remains applicable to such claims.

announced in *Burlington*.[15]  In the instant case, we have no doubt but that

Crawford suffered a materially adverse action in the form of the unfavorable

performance review she received (that affected her eligibility for a merit pay

increase) after she complained of racial discrimination.  Such conduct by an

employer clearly might deter a reasonable employee from pursuing a pending

charge of discrimination or making a new one.  *Burlington*, 126 S.Ct. at 2415.  We

therefore conclude that not only was district court's ruling on Crawford's Title VII

retaliation claim wrong under our prior, narrower standard, but also that it most

certainly is wrong under *Burlington*'s more liberal standard.

B.  Disparate Treatment in Terms and Conditions of Employment

With respect to Crawford's disparate pay claim, the district court

determined that Brennaman was not a proper comparator for purposes of a straight

---

[15]  Some courts have suggested that *Burlington* has little application in cases such as this one in which the plaintiff alleges an ultimate employment action rather than a non-employment-related adverse action.  *See Thomas v. Potter*, 202 Fed.Appx.118, 119 (7th Cir. 2006); *Deprado v. City of Miami*, 2008 WL 269608, *4 n.1 (11th Cir.  February 1, 2008).  Under that view, our prior standard for "ultimate action" retaliation claims might simply be left intact for those cases that naturally fit within it, leaving the new standard to be applied solely to those retaliation cases in which only non-employment-related conduct is implicated.  We do not read *Burlington* to limit its holding in that fashion, however, but rather read it as significantly broadening the standard for both employment-related and non-employment-related employer conduct.  Moreover, we recognize that the application of two separate retaliation standards could be unnecessarily confusing and burdensome.

salary comparison. We agree with that conclusion.[16] *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013,1019 (11th Cir. 1994) (stating that to establish a *prima facie* case of disparate pay, a plaintiff must show she occupies a position similar to that of a higher paid employee who is not a member of her protected class). Not only had Brennaman been employed at GSU for several years longer than Crawford but also Brennaman possessed specialized and highly valued expertise in the information systems field that Crawford does not claim. *See Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 599 (11th Cir. 1994).

The district court noted that Crawford also presented what it termed a "more nuanced pay claim," *i.e.,* that she was not paid at the proper level for her manager position while Caucasian employees in the department, including Brennaman, were paid at the high end of the range for their positions. With respect to this narrower claim the district court apparently accepted, *arguendo*, that Brennaman and the other employees so paid were proper comparators and that Crawford's allegations could constitute adverse employment actions. Again relying on its analysis of *Stavropoulos*, however, the district court reasoned that Crawford's successful grievance, which resulted in an upward adjustment of her salary,

---

[16] Accordingly, any disparate pay claim arising from Crawford's allegations that her compensation was not directly commensurate with Brennaman's compensation, including in connection with Crawford's ultimate promotion to assistant director of human resources, fails.

28

resulted in no loss of salary or benefits and thus she had suffered no adverse employment action.

For essentially the same reasons discussed previously regarding Crawford's merit pay increase claim, we conclude that the district court also erred in finding that Crawford failed to show an adverse employment action in connection with her disparate pay claim.[17]  Although Crawford's salary eventually was adjusted to $54,740 (without the four percent merit pay increase), she was denied the use or benefit of that pay raise during the time it should have been in effect.  Crawford therefore has shown that she was subjected to a serious and material change affecting her compensation that was sufficient to constitute an adverse employment action for purposes of her disparate pay claim.  *See Davis*, 245 F.3d at 1240;  *Phelan*, 463 F.3d at 780.

C.  Denial of Promotion

For the purpose of its discussion the district court accepted that Crawford had established a *prima facie* case of discrimination and retaliation for failure to promote and therefore proceeded to an analysis under *McDonnell Douglas Corp.*

---

[17] Crawford does not appear to claim that these actions were retaliatory in nature.  To the extent she does, we find she has failed to make out a *prima facie* case of retaliation.  Even if the complained-of terms and conditions of Crawford's employment constituted adverse employment actions, the evidence supports no connection between them and any protected activity in which she engaged.  *Pennington*, 261 F.3d at 1266.

29

*v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). So doing, the court rejected Crawford's contentions that the defendants' proffered reasons for not selecting her and eventually eliminating the position were pretextual.

On any Title VII claim the plaintiff bears "the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). She may satisfy her burden by presenting direct evidence of an intent to discriminate or circumstantial evidence using *McDonnell Douglas's* burden-shifting framework. Under this framework, if the plaintiff establishes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination. *See id.* at 804*; Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (*per curiam*). The inquiry into pretext requires the court to determine, in view of all the evidence, "whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and quotations omitted). As with

30

claims of substantive discrimination, Title VII retaliation claims require that "[o]nce the plaintiff establishes [a] *prima facie* case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. If the employer offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Holifield*, 115 F.3d at 1566.

In analyzing Crawford's failure to promote claim, we assume, as did the district court, that Crawford has made out a *prima facie* case of race discrimination and retaliation on this issue.[18] We disagree, however, with the district court's conclusion that no issues of fact remain with respect to whether Crawford has met her burden of showing the defendants' reasons for failing to promote her to the position of director of classification and employment were pretextual. Given the circumstances surrounding the three postings for the position, and the three failures to hire Crawford or otherwise fill the position, we find that Crawford has cast sufficient doubt on the proffered reasons to permit a reasonable factfinder to conclude that the reasons actually were a pretext for discrimination and retaliation.

_____

[18] There is no dispute that, with respect to her discrimination claims, Crawford belongs to a protected class and was qualified to perform the position of director of employment and classification. Also, with respect to her retaliation claim, it is undisputed that she engaged in protected Title VII activity.

31

*Combs*, 106 F.3d at 1538 (11th Cir. 1997); *Holifield*, 115 F.3d at 1566.

Specifically, a reasonable jury could conclude that a "lack of consensus" was a pretextual reason for failing to hire Crawford the first time the position of director of compensation and employment was advertised: the evidence reflects that Johnston chose not to make a hiring decision at that time given Nelson's assessment that Crawford was the best suited candidate, that Nelson had doubts about the actual need for the new position, and that Nelson had expressed concerns over "other incidents in the past" involving Crawford. As to the second posting, defendants have pointed to no reason whatsoever for failing to offer Crawford the position. With respect to the third time the job was posted, and Crawford again was not promoted, a reasonable jury could question whether the explanation given for not hiring her, indeed for not including her in the interview process, was a pretext for discrimination and retaliation.

Finally, regarding the decision to eliminate the new position, we agree with the district court that defendants have come forward with sufficient evidence, in the form of Wright's consulting report, to show that the reasons for the decision were legitimate and non-discriminatory. We further find that, given the circumstances leading up to the decision – in particular the numerous grievances and complaints Crawford filed – a jury question exists on the issue of whether

32

defendants' reasons for eliminating the job were a pretext for retaliation. Crawford has not, however, come forward with evidence adequate to create a jury question on the issue of whether defendants' proffered explanation for the decision in fact was a pretext for racial discrimination. Crawford has failed to produce evidence sufficient for a reasonable jury to conclude that Johnston's stated reasons for withdrawing the position – which include reliance on Wright's independent report and Nelson's advice, as well as the need to respond to the University's budget demands – were not the actual reasons for her decision but that instead she was motivated by racial bias. Accordingly, with respect to Crawford's failure to promote allegations, the retaliation claim may proceed but the racial discrimination claims may not.

In summary, as to Crawford's allegations concerning the denial of a merit pay increase, disparate pay, and the failure to promote, we conclude that genuine issues of material fact exist that preclude summary judgment. We therefore reverse and remand Crawford's Title VII retaliation and race discrimination claims against GSU and her § 1983 equal protection race discrimination claim against Carroll for further proceedings consistent with this decision.

D. Qualified Immunity

Because we conclude that Johnston is entitled to qualified immunity we

33

affirm the district court as to the judgment entered in her favor on Crawford's

§ 1983 equal protection race discrimination claim.[19]

Qualified immunity may provide complete protection for public officials

sued in their individual capacities. *Willingham v. Loughnan*, 321 F.3d 1299, 1301

(11th Cir. 2003) (quotations omitted). Where, as in this case, there is no dispute as

to the discretionary nature of the actions complained of, *see Holloman ex rel.*

*Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004), we proceed to the

two-part test established by the Supreme Court for evaluating a claim of qualified

immunity. The threshold question is whether, "[t]aken in the light most favorable

to the party asserting the injury, do the facts alleged show [that the official's]

conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121

S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If a constitutional right would have

been violated under the plaintiff's version of the facts, the court must then

determine "whether the right was clearly established." *Id.* "For the law to be

clearly established to the point that qualified immunity does not apply, the law

---

[19] As previously noted, the only claim that remains against Johnston is for race discrimination, not retaliation. The magistrate judge recommended finding that Johnston was not subject to liability under § 1983 on the race discrimination claim but that, even if she were, qualified immunity would shield her. The district court concluded that Crawford had not suffered any constitutional violations and that it therefore need not consider whether the individual defendants were entitled to the defense of qualified immunity. Carroll does not rely on qualified immunity in this appeal but Johnston does make a bare assertion of entitlement to it, to which Crawford not responded.

34

must have earlier been developed in such concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Riley v. Newton*, 94 F.3d 632, 636 (11th Cir. 1996) (quotations omitted). Qualified immunity affords "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). We have noted that "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (quoting *Saucier*, 533 U.S. at 202). "The Supreme Court has urged us to apply the affirmative defense of qualified immunity at the earliest possible stage in litigation because the defense is immunity from suit and not from damages only." *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001) (*en banc*).

Johnston's liability under § 1983 as Carroll's supervisor must be based on something more than the theory of *respondeat superior*. *Braddy v. Florida Dep't. of Labor and Employment Security*, 133 F.3d 797, 801 (11th Cir. 1998). In *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990), we observed that

> Supervisor liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the

alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.

906 F.2d at 671 (citations omitted).

First, the evidence taken in the light most favorable to Crawford reflects that Johnston cursorily approved Carroll's unfavorable performance evaluation of Crawford. The evidence also reflects that during Johnston's forty-five minute meeting with Crawford regarding her complaint alleging retaliation and discrimination Johnston seemed indifferent to Crawford's concerns, and she later issued a rather dismissive written denial of Crawford's complaint.[20] In addition, Johnston was involved in the selection process for the new director position the first time it was posted to the extent she interviewed but declined to endorse one candidate and did not interview any other candidates because she was not asked to do so. Ultimately, Johnston agreed with Nelson – whose approval Johnston testified she needed before hiring a candidate – that the position should not be filled at that time, in part due to concerns over Crawford's pending grievances.

---

[20]  As noted, the complaint cited, among other issues, the denial of Crawford's merit pay increase, the disparity between her pay and that of others in her department, and her nonselection for the new director position.

There is no evidence that Johnston was involved when the position was posted a second time. With respect to the third posting of the position, Johnston's involvement included telling Carroll to broaden the group of selectors, responding briefly when Carroll informed Johnston that she had narrowed the field of candidates to three unnamed persons, and again acceding to Nelson's advice against filling the position while Crawford's race discrimination claims were pending. None of this evidence of Johnston's involvement in the events of which Crawford complains is sufficient to show that Johnston personally engaged in any conduct that constitutes a violation of the equal protection clause, which ensures the right to be free from intentional discrimination based on race. *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir. 2003). There is no hint of a racially discriminatory motive in any of Johnston's conduct, the most questionable of which at worst reflects the exercise of poor professional judgment rather than gross incompetence or the intentional commission of constitutional violations. In short, none of the actions in which Johnston was personally involved rises to a level sufficient to divest her of qualified immunity.

Nor does the record support imposing liability against Johnston for Carroll's alleged constitutional violations because she was aware of widespread abuse by Carroll and failed to take corrective action. *See also Gonzalez v. Reno*, 325 F.3d

37

1228, 1234 (11th Cir. 2003). In this case, even if Johnston's conduct in answering Crawford's complaint was ineffectual, insensitive, or otherwise less responsive than it might have been, it was not constitutionally inadequate for purposes of qualified immunity. Johnston testified that she did not take any independent action regarding Crawford's allegations because she understood, correctly as the evidence shows, that the claims were being independently investigated by the OAADP. Moreover, a comprehensive desk audit of Crawford's position and the entire human resources department, as ordered by Patton with Johnston's encouragement, was subsequently completed by Wright. Thus, as other corrective action was being taken with respect to Crawford's complaints, it was unnecessary, in fact could have been duplicative or counterproductive, for Johnston to act as well at that time. Because there is no evidence of the existence of widespread abuse which Johnston failed to redress, and thus no causal connection between Johnston's actions and the alleged violations of Crawford's constitutional rights, Johnston should not be stripped of the protection of qualified immunity.[21]

---

[21] As noted, the parties devote little or no attention in this appeal to Johnston's claim of entitlement to qualified immunity. We nevertheless note that Crawford argued below that "cat's paw" liability applied in this case because Johnston merely "rubber stamped" Carroll's allegedly discriminatory conduct. Under a "cat's paw" theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct. *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's

38

## IV. Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to GSU on Crawford's Title VII retaliation and race discrimination claims and to Carroll on Crawford's § 1983 race discrimination claim. We AFFIRM the district court's grant of summary judgment to Johnston. This case is REMANDED to the district court for further proceedings consistent with this opinion.

**REVERSED and REMANDED IN PART; AFFIRMED IN PART.**

---

discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (*per curiam*). Here, the evidence does not support the contention that Carroll exercised undue influence over Johnston. Rather, contrary to Carroll's wishes, Johnston declined to endorse Strasner for the new position the first time it was posted. Also, following Nelson's advice but against Carroll's recommendation, Johnston declined to extend an offer to Willis on the job's third posting. Finally, because Johnston reviewed Crawford's complaint and met with her to discuss the issues it presented – albeit not to Crawford's satisfaction – Crawford has failed to show a causal connection between Carroll and Johnston's actions pursuant to a "cat's paw" theory of liability. *Id.* at 1332.