[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15177
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 9, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00340-CV-ORL-18GJK

JUDITH MATIAS,

                                                                    Plaintiff,

DENRY BROWN,

                                                        Plaintiff-Appellant,

versus

SEARS HOME IMPROVEMENT PRODUCTS, INC.,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 9, 2010)

Before CARNES, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Denry Brown, an African-American male, appeals the district court's order granting summary judgment to his former employer, defendant Sears Home Improvement Products, Inc., on his claims of race discrimination, retaliation, and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), and the Florida Civil Rights Act, Fla. Stat. § 760.10. After thorough review, we affirm.

I.

In April 2005, Brown began his employment with Sears. He was hired as a Project Consultant in the Kitchen Department of Sears' Orlando, Florida office. As a Project Consultant, Brown was responsible for making in-home sales presentations during pre-set sales appointments known as "leads." Sears compensated its Project Consultants, including Brown, on a commission basis.

District Sales Manager Lowell Merklin, Brown's immediate supervisor, distributed sales leads to Project Consultants, including Brown, on a daily basis. Every morning, at approximately 7:00 a.m., Merklin received information from Sears' Appointment Center concerning between twenty-five and forty leads scheduled for that day. Merklin was required to assign and distribute those leads to the Project Consultants by 8:30 a.m. every morning. Project Consultants typically

received two leads per day.

Sears divides leads into categories. "Prime" leads are those leads in which both homeowners will be present during the sales presentation. Prime leads are considered the highest quality leads because the presence of both homeowners during the in-home sales presentation increases the likelihood that a sale will be closed that day. Sears' Operating Procedures Manual provides that sales leads should be distributed to product consultants "primarily with consideration to net closing percentage . . . and positive attitude." Brown admits that, under Sears' operating procedures, the Project Consultants with the best net closing percentages and attitudes should receive more prime leads than their colleagues.

A Project Consultant's "net closing percentage" is the percentage of that Project Consultant's prime leads that resulted in a sale. Because only prime leads are considered in calculating a Project Consultant's net closing percentage, non-prime leads that do not result in a sale do not lower that Project Consultant's net closing percentage. Sears' operating procedures require all Project Consultants to maintain a net closing percentage equal to or greater than a target level established by Sears.

During March 2006, Sears received through its Ethics Hotline an anonymous complaint alleging that Merklin was distributing leads in a discriminatory manner.

3

Sears' Regional Human Resources Manager, Charles Klinzing, immediately investigated the complaint. During the investigation, Klinzing reviewed the sales lead assignments and interviewed at least eight Project Consultants who worked under Merklin. Brown was one of the eight Project Consultants interviewed. When specifically asked, Brown replied that he did not feel that Merklin, or any other manager, was distributing leads in a discriminatory manner. Sears' Human Resources Department was ultimately unable to substantiate the anonymous complaint. Sears later learned, after Brown ended his employment with Sears, that Project Consultant Thomas Ridley, an African-American, was the source of the anonymous complaint.

Brown admits that he never made an internal complaint about discrimination and that he never called Sears Ethics Hotline. However, on September 29, 2006, Brown filed a "complaint of discrimination" with the Florida Commission on Human Relations. In that complaint, Brown alleged that Merklin was assigning leads in a discriminatory manner. Specifically, Brown stated that Merklin was assigning minority Project Consultants leads in low-income, low-home-value areas while assigning white Project Consultants leads in high-income, high-home-value areas. In response to Brown's allegations, Sears filed a Position Statement with the Florida Commission on Human Relations on October 25, 2006. The next day,

4

Merklin signed an affidavit stating that the information in Sears' Position Statement relating to Merklin's conduct was, to the best of his knowledge, true.

On October 31, 2006, Merklin issued Brown a Performance Plan for Improvement. The PPI was written by Metro Sales Manager Poole. The PPI noted that, from September 24 to October 24, 2006, Brown's net closing percentage was 57.7% below the established target. It also stated that Brown's net closing percentage was 36% off-target for the previous thirty-day period. According to the PPI, the "minimum acceptable level of performance is -18% variance to target, with progress being shown to move [net closing percentage] above target level."

On February 5, 2007, Brown voluntarily resigned his employment with Sears. When he resigned, Brown did not make any mention of racial discrimination. Instead, he told Sears that he was resigning because he was dissatisfied with his pay.

On March 7, 2008, Brown filed the lawsuit giving rise to this appeal. Brown asserted claims of race discrimination and retaliation under Title VII and the Florida Civil Rights Act. On September 9, 2009, the district court granted Sears' motion for summary judgment. Brown timely filed a notice of appeal.

II.

We review de novo a district court's grant of summary judgment, and, "[i]n

doing so, we view all the evidence, and make all reasonable factual inferences, in the light most favorable to the nonmoving party." Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1243 (11th Cir. 2004) (quotation marks and citation omitted). "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). In order to survive a motion for summary judgment, more than a "mere 'scintilla' of evidence" must support the position of the nonmoving party; "there must be enough of a showing that the jury could reasonably find for that party." Brooks v. County Comm'n of Jefferson County, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

When reviewing a district court's grant of summary judgment, we apply the same legal standards as the district court. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (2001). In this case, those standards are provided by Title VII and the decisions construing it. That is because the "Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act." Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998); see also Florida State Univ. v. Sondel, 685 So.2d 923, 925 n.1 (Fla. 1st DCA 1996); Byrd v. BT Foods, Inc., 948 So.2d 921, 925 (Fla. 4th

6

DCA 2005). Because the analysis of Brown's Florida Civil Rights Act claims mirrors the analysis of his Title VII claims, we do not discuss the Florida Civil Rights Act claims separately. See Harper, 139 F.3d at 1387, 1389–90.

### III.

Brown argues that the district court erred in dismissing his claim of race discrimination. See 42 U.S.C. § 2000e-2(a)(1); see also Fla. Stat. 760.10(1)(a). A plaintiff may establish a claim under Title VII through direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1103 (11th Cir. 2001), abrogation on other grounds recognized by Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008). Brown does not argue that he has shown direct evidence of discrimination. Instead, Brown argues that he has presented sufficient circumstantial evidence to create an inference of discrimination.

We use the framework established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), to evaluate Title VII claims based on circumstantial evidence. Bass, 256 F.3d at 1103–04. Under the McDonnell-Douglas framework, "the plaintiff has the initial burden of establishing a prima facie case of discrimination." Combs v. Plantation Patterns, 106 F.3d 1519, 1527–28 (11th Cir. 1997). To establish a prima facie case, Brown "must show (1)

7

[he] belongs to a protected class; (2) [he] was qualified to do the job; (3) [he] was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside [his] class more favorably." Crawford, 529 F.3d at 970.

The district court did not err in granting Sears' motion for summary judgment because Brown has not shown that he was subjected to an adverse employment action. To show an adverse employment action, "an employee must show a serious and material change in terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). In order to qualify as an adverse employment action, an employer's action falling short of an ultimate employment decision "must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." Crawford, 529 F.3d at 970. "Although [Title VII] does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse impact on the plaintiff's employment" as "viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239.

Brown does not take issue with the amount of leads, or the amount of prime

8

leads, that he was assigned. Instead, Brown argues that he was subjected to an adverse employment action because Merklin assigned him leads for homes with a lower average income and lower average home value than the leads received by non-African-American Project Consultants. According to Brown, Merklin's discriminatory lead assignment practices lowered his chance of success during each sales presentation, resulting in a lower net closing percentage and reduced commissions.

Assuming that the discriminatory assignment of leads could constitute an adverse employment action, Brown's argument fails. The undisputed record evidence shows that the average annual income per household for Brown's leads is only seventy-three dollars less than the average annual income per household for the leads of non-African-American Project Consultants. That is a difference of only 0.17%. Similarly, the average home value for Brown's leads is only $227 less than the average home value for the leads of non-African-American Project Consultants. That is a difference of only 0.21%. Furthermore, the median home value for Brown's leads is exactly the same as the median home value for the leads of non-African-American Project Consultants, and the median household income for Brown's leads is actually $490 greater than the median household income for the leads of non-African-American Project Consultants.

9

The differences between the average home values and incomes for Brown's leads and those of non-African-American Project Consultants are so small that they are meaningless. The minuscule differences in lead assignments of which Brown complains are not "serious and material," Crawford, 529 F.3d at 970–71, and could not reasonably be viewed as having "a tangible adverse impact on the plaintiff's employment." Davis, 245 F.3d at 1239. Merklin's allegedly discriminatory assignment of leads therefore does not constitute an "adverse employment action" within the meaning of Title VII. Id. Furthermore, Brown has not identified any similarly situated employees outside his class, much less demonstrated that those employees were treated more favorably. Because Brown has not established a prima facie case of discrimination, our analysis goes no further. The district court did not err in granting summary judgment on Brown's race discrimination claim.

IV.

Brown also argues that the district court erred in dismissing his claim of retaliation. See 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7). To establish a prima facie case of retaliation under Title VII, "a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." Goldsmith v. Bagsby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008) (citing Burlington N. & Santa

Fe Ry. Co. v. White, 548 U.S. 53, 59–71, 126 S. Ct. 2405, 2410–16 (2006)). If the plaintiff makes out a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse action. Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999) (quotation marks and citation omitted).

If the employer articulates a legitimate reason for the adverse action, the plaintiff must show that the reasons articulated by the employer were actually a pretext for prohibited retaliation. McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008). We have explained that the plaintiff must meet the employer's proffered legitimate reason "head on and rebut it." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). In order to establish that the employer's articulated reasons were a pretext for retaliation, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." McCann, 526 F.3d at 1375 (quotation marks and citation omitted).

Brown argues that Sears retaliated against him by issuing the PPI. Sears has offered a legitimate reason for issuing the PPI: Brown's net closing percentages had consistently fallen short of the target. The undisputed evidence shows that,

11

between September 24, 2006 and October 24, 2006, Brown's net closing percentage was 5.41%. Brown had missed the target net closing percentage by more than 57.7%. During the thirty day period previous to September 24, 2006, Brown's net closing percentage fell 36% short of the target. Because Sears has offered a legitimate reason for issuing Brown the PPI, namely Brown's consistently poor and worsening sales record, the issue is whether Brown has shown that Sears' proffered reason is actually a pretext for unlawful retaliation. McCann, 526 F.3d at 1375.

Even assuming that Brown has established a prima facie case, Brown's retaliation claim fails because he has not raised a genuine issue of material fact as to whether Sears' proffered legitimate reason for issuing the PPI was a pretext for retaliation. Brown argues that there is a genuine issue of material fact as to pretext because, although he had fallen short of the target net closing percentage for nine consecutive months before the PPI was issued, Sears did not issue the PPI until one month after Brown filed his "complaint of discrimination" with the Florida Commission on Human Relations, and four days after Merklin signed an affidavit demonstrating his knowledge of that filing.

Brown's argument misses the mark. First, Brown does not argue that temporal proximity, standing alone, is sufficient to establish pretext. Nor could he

12

under our precedent.  See Hulbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1289 (11th Cir. 2006) (discussing claim of retaliation under the Family and Medical Leave Act of 1993); Wascura v. City of S. Miami, 257 F.3d 1238, 1244–45 (11th Cir. 2001).  Second, Brown's reliance on the fact that he had fallen short of the target net closing percentage for nine consecutive months, and yet had not been issued a PPI, is misplaced.  His argument ignores the fact that his sales performance had not only remained substandard, but had actually dropped as low as it could go in the last full month before the PPI was issued:  Brown had a net closing percentage of 0% during September 2006.  Viewed in the light most favorable to Brown, the evidence is insufficient to permit a reasonable factfinder to conclude that Sears issued the PPI out of retaliation, rather than as a result of Brown's remarkably poor work performance.  Combs, 106 F.3d at 1528.

V.

Brown also argues that the district court erred in dismissing his claim of constructive discharge.  "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."  Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) (quotation marks and citation omitted), cert. denied 130 S. Ct. 1536 (2010).  We have set a high bar for claims of constructive discharge:  "A claim for constructive

13

discharge requires the employee to demonstrate that the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Virgo v. Riviera Beach Assoc., 30 F.3d 1350, 1363 (11th Cir. 1994).

Brown argues that, taken together, the alleged discriminatory assignment of leads and the allegedly retaliatory PPI create a genuine issue of material fact as to whether he was constructively discharged by Sears. Brown concedes that neither the alleged discrimination nor the alleged retaliation, standing alone, would be sufficient to state a claim of constructive discharge. We need not consider that question. Because Brown has not established that he suffered race discrimination or retaliation, his argument that a combination of race discrimination and retaliation resulted in his constructive discharge necessarily fails.

Furthermore, the undisputed evidence shows that Brown never complained to Sears about the alleged discrimination and retaliation, and that he denied that leads were being distributed in a discriminatory manner when questioned by Sears during the investigation of an anonymous complaint filed by another employee. Brown's failure to avail himself of Sears' policies and procedures for reporting and resolving complaints of discrimination is especially glaring in light of the extensive information and training Brown received regarding Sears' Equal Employment

14

Opportunity Policy.  Not only is Brown's failure to avail himself of Sears'

mechanisms for reporting and resolving complaints of discrimination glaring, it is

also fatal to his claim of constructive discharge.  See Bryant, 575 F.3d at 1299.

## VI.

The district court did not err when it granted summary judgment to Sears on

Brown's claims under Title VII and the Florida Civil Rights Act.  Accordingly, we

affirm.

**AFFIRMED.**