[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10501
Non-Argument Calendar
_____

D.C. Docket No. 8:15-cv-02246-JDW-TGW


BOBBY WALKER, JR.,

Plaintiff - Appellant,

versus

INDIAN RIVER TRANSPORT CO.,
a Florida Profit Corporation,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 27, 2018)


Before TJOFLAT, JILL PRYOR and NEWSOM, Circuit Judges.

PER CURIAM:

Bobby Walker, Jr. resigned from his job as a truck driver and then sued his former employer, Indian River Transport Co., alleging that it failed to accommodate his religious beliefs and discriminated and retaliated against him for requesting Sundays off so that he could attend religious services.  The district court granted summary judgment for Indian River, and Walker appealed.  After careful review, we affirm.

## I.    BACKGROUND

### A.    Factual History

Walker began attending services at the Kingdom Hall of Jehovah's Witnesses when he was eight or nine years old.  Although he grew up in the church, his faith deepened in adulthood and he now attends church services and meetings every week, including special programming where congregants learn to minister and lead.  Walker's religious beliefs do not prohibit him from working during weekends, but he must be able to attend Sunday services at the church.

Indian River hired Walker as a truck driver in November 2013.  At first, Walker was assigned to regional and long haul routes while he waited for an opening on a local route close to his home in Florida.  Often he was unable to take Sundays off to attend religious services while he drove these longer routes.  Then, in March 2014, Indian River assigned Walker to a local route transporting milk

2

from a dairy in Live Oak, Florida, to a processing facility in Orlando.  At the time, this route was a new account for Indian River.

The milk route created logistical difficulties for Indian River and its drivers. Because milk production never stopped, the dairy required Indian River to have an empty tanker available onsite at all times.  Loading empty tankers at the dairy posed no problem, but unloading at the Orlando processing facility demanded driver flexibility.  Drivers often had to wait for hours after they arrived at the processing facility before their tankers could be unloaded.  The wait times were unpredictable, and multiple Indian River drivers frequently were waiting simultaneously for their tankers to be unloaded.  This situation created a shortage of drivers available to drop off empty tankers at the dairy; Indian River sometimes had to call off-duty drivers to substitute for the drivers who were tied up at the processing facility.  Under Indian River's agreement with the dairy, if Indian River failed to provide an onsite empty tanker, it could be held liable for any milk that was lost due to that failure.  Because of the unpredictability in unloading at the processing facility, Indian River struggled to maintain a consistent driver schedule. As a result, drivers assigned to the milk route had to be flexible with their schedules.

Walker experienced a long wait time at the processing facility one Saturday evening less than two weeks after Indian River assigned him to the milk route.  He

3

used the recording system inside his truck to take a video of himself explaining that he had begun the milk route that morning but was still waiting for his tanker to be unloaded at the processing facility after 9:00 p.m.  He also explained that if his truck was not unloaded that night he would have to wait at the processing facility until Monday morning because the facility did not receive deliveries on Sundays.[1]  He noted that the long wait time took him "[w]ay beyond [his] hours of service" and that he "require[d] at least one day off."  Doc. 14-11 at 26.[2]  Most importantly, he explained that he was a Jehovah's Witness and wished to have Sundays off so that he could attend church services.

A day or two after Walker created the video, he was called into Indian River's office for a meeting to discuss it with his dispatcher, Angel Deliz, and one of Indian River's vice presidents of operations, Todd Godwin.  According to Walker, Deliz and Godwin "looked kind of upset," and Godwin told him that he "c[ould not] let [his] religion get in the way of" his work.  Doc. 14-11 at 29.  Walker also testified that Deliz told him that Deliz's wife was "real serious about her church too . . . but . . . she'll put her job ahead of that."  *Id.* at 30.  Deliz, however, denied ever speaking with Walker about his wife's religion.  During the

---

[1] Indian River disputes that the processing facility was closed for deliveries on Sundays, but because this is an appeal from a ruling on Indian River's motion for summary judgment, we consider the facts in the light most favorable to Walker, the non-moving party.  *See Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).

[2] Citations to "Doc. #" refer to numbered entries on the district court's docket.

meeting, Deliz explained that drivers who needed Sundays off could not be assigned to the milk route given the unpredictability of the scheduling and the need for driver flexibility. Deliz and Godwin told Walker that he had to be reassigned and that they would "find something else for [him]." *Id.*

Walker drove the milk route three more times after his meeting with Deliz and Godwin, on March 17, 18, and 25. None of these days was a Sunday.[3] Then he was assigned to a different dispatcher, Joy Primavera. Walker testified that Primavera did not call to offer him any work for several weeks after he was assigned to her. In the meantime, Walker filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on April 18. Walker testified that Primavera eventually reached out to him, but not until after he filed his EEOC charge.

Other evidence shows, though, that Indian River employees reached out to Walker and that he drove for Indian River after he was reassigned to Primavera but before he filed his EEOC charge. First, Walker's "movement display"—a chart listing the runs he drove for Indian River—shows that he worked on March 29 (Saturday) and 31 (Monday) and on April 1 (Tuesday). Second, Indian River's phone records show outgoing calls to Walker on March 31 and April 1, 7, and 15.

---

[3] In some instances, the record is silent as to which day of the week certain dates fell on in 2014. We take judicial notice of the 2014 calendar for purposes of filling in these gaps. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

Third, Steve Ferguson, Indian River's Director of Human Resources, sent an email to Primavera on April 15, asking when she had last dispatched Walker and whether she had been "unable to accommodate" him "being off for church or any other religious events." Doc. 14-10 at 3. Primavera responded that she had not spoken with Walker for over two weeks, but that she had called him "several times with no luck talking to him." *Id.*

Indian River continued to offer Walker work after he filed his EEOC charge. On Friday, April 18, Ferguson wrote a note to Primavera that he had spoken with and offered Walker work for that day and the weekend. The note said that Walker had declined the work but would call Indian River on the following Monday. Walker denied that Ferguson offered him work on April 18—testimony we must credit on summary judgment—but he acknowledged that he was told to call Indian River on Monday, April 21. Walker's movement display shows that he then worked on April 21 and four other days in April, including one Sunday.

Walker was dissatisfied with the work he was offered after Indian River removed him from the milk route. He testified that the routes he was offered did not pay well and that in some instances Indian River would not tell him in advance how much he would be paid for the routes because the amount was so low. Walker told Primavera that he wanted to be assigned to a dedicated route, meaning a local

6

route that he could perform on a consistent schedule, but Primavera told him that she had no openings on dedicated routes.

According to Walker, his request for Sundays off also resulted in several other negative consequences in addition to being offered only low paying routes. First, he testified that Primavera and Ferguson were "argumentative" and "aggressive" toward him and that Ferguson "kept an eye on" him anytime he went into Indian River's offices. Doc. 14-11 at 54. Second, he testified that Indian River began to assign him inferior equipment. In particular, he testified about two instances following his request for Sundays off when he experienced mechanical problems with his truck. Third, he relies on two emails between two Indian River employees as support for his contention that his request for an accommodation resulted in his being deemed "problematic." In the first email, Ferguson told JJ Harned, one of Indian River's vice presidents of operations, that Walker was pulled off the milk route because he was "problematic on that run" and "one of the primary issues was that . . . he require[d] Sundays off to attend church." Doc. 18-1 at 8. In the second email, in which Harned replied to the first email, Harned asked Ferguson to keep him posted about Walker because "this guy is problematic." *Id.* at 11.

Although Walker testified that his request for Sundays off is what caused these negative consequences, Primavera expressed difficulty working with him. At

7

one point, she emailed Ferguson and Harned to report that Walker had been complaining because he had not yet received a dedicated route. She also noted that Walker was scheduled to begin a run in less than an hour and that she had "left about 11 voice mails with no[] response." Doc. 14-10 at 2. She said that she "c[ould] not make [Walker] [h]appy" and "c[ould] not work with . . . him." *Id.* Harned responded first, saying that "[t]his driver either needs to disappear or run [long haul routes]." *Id.* Then Ferguson responded that he had left a message for Walker and would "deal" with him. *Id.*

The frustrations expressed in Primavera's email were consistent with other evidence showing that Walker was, at times, difficult to manage. Deliz testified that on one occasion while Walker was still assigned to the milk route, Walker took a load home with him rather than driving straight to the processing facility and failed to inform dispatch that he was doing so. Primavera similarly testified that Walker once dropped a loaded trailer off at the Indian River yard rather than waiting for it to be unloaded at the client's business because the wait time was too long for him. She also testified that he declined work on more than one occasion because the routes she offered him involved long wait times.

Walker resigned from his employment with Indian River on May 3, 2014. Earlier that day, Ferguson had called Walker and asked him to bring his truck to Indian River's offices. While Walker was driving to the office, his truck

8

malfunctioned.  Believing that Ferguson was going to fire him, Walker decided to "resign and forget it."  Doc. 14-11 at 39.  He called Indian River's maintenance contractor to come assist him and wrote out a resignation letter as he waited to hand over the key to his truck.  In the letter, Walker said that he was resigning due to truck safety problems, explaining that he thought Indian River might have intentionally caused the problems due to his EEOC charge.

## B.    Procedural History

Walker sued Indian River under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that Indian River failed to accommodate his religious practices.  He also alleged that Indian River discriminated and retaliated against him for requesting Sundays off and for filing a charge of discrimination with the EEOC.  Indian River moved for summary judgment on all of Walker's claims, and the district court granted the motion.  This is Walker's appeal.[4]

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party.  *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[4] Walker's motion to file an amended reply brief out of time is GRANTED.

9

R. Civ. P. 56(a).  "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." *Moton*, 631 F.3d at 1341 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## III.    DISCUSSION

### A.    Walker's Failure to Accommodate Claim Fails Because Indian River Offered Walker a Reasonable Accommodation.

Walker first argues that the district court erred in granting summary judgment for Indian River on his claim for failure to reasonably accommodate his religious practices.  Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).  The word "religion" is defined to "includ[e] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate" a "religious observance or practice without undue hardship on the conduct of the employer's business."  *Id.* § 2000e(j).  Put differently, these provisions mean that "[a]n employer has a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.'"  *Walden v. Ctrs. for Disease Control &*

10

*Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

To succeed on a claim based on an employer's failure to accommodate religious practices, an employee must first establish a prima facie case of religious discrimination by showing that he (1) had a bona fide religious belief that conflicted with an employment requirement, (2) informed his employer of his belief, and (3) was disciplined or discharged for failing to comply with the conflicting employment requirement. *See Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007). After the employee establishes a prima facie case, "the burden shifts to the employer to demonstrate that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Dixon v. Hallmark Cos.*, 627 F.3d 849, 855 (11th Cir. 2010) (internal quotation marks omitted).

The district court concluded that Walker's claim that Indian River failed to reasonably accommodate his religious practices failed for three reasons: (1) Walker failed to establish a prima facie case because he offered no evidence that he suffered an adverse employment action, (2) Indian River provided Walker with a reasonable accommodation as a matter of law by offering him routes other than the milk route, and (3) Indian River could not have accommodated Walker's request to

11

stay on the milk route while also having Sundays off without suffering an undue hardship.  We need not review each of these reasons, however, because we agree with the district court that Indian River offered Walker a reasonable accommodation as a matter of law.

Title VII does not define the term "reasonably accommodate."  *Beadle v. Hillsborough Cty. Sheriff's Dept*, 29 F.3d 589, 592 (11th Cir. 1994).  "Thus, the precise reach of the employer's obligation to [reasonably accommodate] its employee is unclear under the statute and must be determined on a case-by-case basis."  *Id.*  But "the Supreme Court has explained that a reasonable accommodation is one that 'eliminates the conflict between employment requirements and religious practices.'"  *Morrissette-Brown*, 506 F.3d at 1322 (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986)).  An employer need not "give an employee a choice among several accommodations," nor must it "demonstrate that alternative accommodations proposed by the employee constitute undue hardship."  *Walden*, 669 F.3d at 1293-94.  Instead, "the inquiry ends when an employer shows that a reasonable accommodation was afforded the employee, regardless of whether that accommodation is one which the employee suggested."  *Beadle*, 29 F.3d at 592.

Indian River offered Walker a reasonable accommodation as a matter of law. As Deliz explained, drivers who needed a particular day off each week were not a

12

good fit for the milk route.  The unpredictable wait times at the processing facility meant that even off duty drivers had to be prepared to work unexpectedly to deliver empty tankers to the dairy.  Because the need for extra drivers could arise at any time, all of the drivers assigned to the milk route had to be flexible with their scheduling.  Walker's need for Sundays off meant that he lacked the required flexibility, so Indian River accommodated him by offering him non-dedicated local routes that would not involve the possibility of mandatory Sunday work.  This accommodation was reasonable because it "eliminate[d] the conflict between [Walker's] employment requirements and [his] religious practices."  *Morrissette-Brown*, 506 F.3d at 1322 (internal quotation marks omitted).

Walker disagrees, arguing that the accommodation he was offered was unreasonable for four reasons.  First, he argues that Indian River failed to eliminate the conflict between his employment requirements and his need for Sundays off because "a substantial percentage of runs offered to him after he was taken off the [milk] run required Sunday work."  Appellant's Br. at 9.  It is true that Indian River offered Walker work on a Sunday once or twice after his request, but Walker acknowledged that Indian River permitted its drivers to decline routes.  We would agree with Walker that the accommodation was unreasonable, or that there was in fact no accommodation, had Indian River required Walker to work on Sundays or offered him only Sunday routes.  But Walker does not dispute that he was

13

offered—and accepted—routes on many days other than Sundays, including March 29 and 31, as well as April 1, 21, 22, 29, and 30.  The fact that Indian River also offered Walker the occasional Sunday route does not change our conclusion that it provided him with a reasonable accommodation.[5]

Second, Walker contends that it was unreasonable to remove him from the milk route because he needed only a few hours off on Sundays to attend his religious services, not the entire day, and he could have driven his truck to church and then returned to the processing facility.  This argument fails because Indian River had no obligation to provide him with the accommodation of his choice.  *See Walden*, 669 F.3d at 1293-94.  Walker may have preferred an accommodation that allowed him to remain on the milk route and drive his truck to church for a few hours on Sundays, but Indian River satisfied its duties under Title VII by changing his work schedule to eliminate the possibility of mandatory Sunday work.  *See Beadle*, 29 F.3d at 592 ("[T]he inquiry ends when an employer shows that a reasonable accommodation was afforded the employee, regardless of whether that accommodation is one which the employee suggested.").

Third, Walker argues that it was unreasonable to remove him from the milk route because, until his request for Sundays off, his assignment to that route had

---

[5] Walker also argues that Indian River easily could have offered him non-Sunday work because many of its customers were closed on Sundays.  But we need not separately address this argument given our conclusion that Indian River provided Walker with a reasonable accommodation by offering him work on many days other than Sunday.

14

never required Sunday work. We reject this argument because Walker drove the milk route for the first time on March 4 and then requested Sundays off on March 15—less than two weeks later. Only one Sunday passed during that time period. The fact that the milk route did not require Walker to work on that one Sunday was insufficient to establish that he could have been off every Sunday had he remained assigned to the milk route.

Fourth, Walker contends that Indian River failed to reasonably accommodate him because the routes he was offered after his request paid less than the milk route. But an accommodation may be reasonable even if it adversely impacts the employee to some extent. *See, e.g.*, *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 502 n.23 (5th Cir. 2001) (noting that "a significant reduction in salary" was insufficient on its own to make an accommodation unreasonable). Although we do not foreclose the possibility that in some circumstances an accommodation may be unreasonable when it demands a substantial reduction in pay, the evidence is insufficient for us to draw that conclusion in this case. Here, Walker testified that in one instance Indian River paid him "barely" $20 for a local route that took him "all day," and that the routes he was offered generally paid less than the milk route. Doc. 14-11 at 68. But the evidence showed that dedicated local routes like the milk route and non-dedicated local routes paid differently. Although Walker told Primavera that he wanted to be assigned to a dedicated local

15

route, she lacked any openings on that type of route. So assigning Walker to non-dedicated local routes was the only way to ensure that he would not have mandatory Sunday work. The fact that at least some of those routes happened to pay less than the milk route is insufficient to render the accommodation unreasonable.

In sum, we conclude that Indian River offered Walker a reasonable accommodation by removing him from the milk route and offering him other routes because doing so eliminated the possibility of mandatory Sunday work. The district court did not err, therefore, in granting summary judgment for Indian River on Walker's claim for failure to accommodate his religious practices.

## B.   Walker's Discrimination and Retaliation Claims Fail Because He Has Provided No Evidence of Discriminatory or Retaliatory Intent.

Walker next argues that the district court erred in granting summary judgment for Indian River on his discrimination and retaliation claims. As we noted above, Title VII prohibits employers from discriminating against employees because of their religious practices. *See* 42 U.S.C. § 2000e-2(a)(1). In addition to prohibiting discrimination, Title VII also prohibits retaliation by making it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." *Id.* § 2000e-3(a).

16

A Title VII plaintiff bears the burden of proving discrimination or retaliation by a preponderance of the evidence. *See Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008). He may carry this burden by presenting either direct or circumstantial evidence of his employer's discriminatory or retaliatory intent. *Id.* at 975-96. When, as here, a discrimination or retaliation claim is supported by circumstantial evidence, we analyze it according to the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1305 (11th Cir. 2002) (discrimination); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (retaliation). Under this framework, the employee must first establish a prima facie case of discrimination or retaliation. *See Crawford*, 529 F.3d at 976. If the employee establishes a prima facie case, the burden shifts to the employer to articulate "some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (internal quotation marks omitted). If the employer makes this showing, the burden shifts back to the employee "to show that the employer's stated reason was pretext." *Id.*

The elements of a prima facie case of discrimination differ from those of a prima facie case of retaliation. A prima facie case of discrimination requires proof that the employee was (1) a member of a protected class, (2) subjected to an adverse employment action, (3) treated less favorably than similarly situated

17

employees outside of his class, and (4) qualified to do the job. *See McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). A prima facie case of retaliation, by contrast, requires proof that (1) the employee engaged in statutorily protected expression, (2) the employee suffered an adverse employment action, and (3) there was a causal connection between the two events. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

The differences between discrimination and retaliation claims matter little in this case, however, because the only element in dispute is common to both types of claims: whether Walker suffered an adverse employment action. Walker points to an array of actions by Indian River that he argues constituted an adverse employment action: assigning him Sunday work, offering him only lower paying routes, providing him with inferior equipment, and subjecting him to heightened surveillance and discipline. Indian River responds that none of these actions rises to the level of severity needed to establish a prima facie case of discrimination or retaliation. We agree with Indian River for the most part, except we conclude that Walker's evidence that Indian River offered him only lower paying routes was sufficient to create a genuine dispute of material fact as to whether he suffered an adverse employment action.

Retaliation claims may be supported by a broader range of adverse employment actions than substantive discrimination claims. *See Burlington N. and*

18

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").  For retaliation claims, the employee only must show that "a reasonable employee would have found the challenged action materially adverse," meaning that "it well might have dissuaded a reasonable worker from [engaging in the protected activity]."  *Id.* at 68 (internal quotation marks omitted).  For discrimination claims, by contrast, an employee must show that he suffered a "serious and material change in [the] terms, conditions, or privileges of his employment."  *Crawford*, 529 F.3d at 974 n.14 (internal quotation marks omitted).

Walker's proof regarding most of Indian River's purported adverse employment actions was insufficient to satisfy either of these standards.  First, Walker contends that he was "assigned" Sunday work, but in reality Indian River only *offered* him Sunday work.  As we have already discussed, Walker was free to accept or decline runs for any reason, and the majority of runs that Indian River offered him after he requested an accommodation were for days other than Sunday.  Thus, Indian River's decision to offer Walker a handful of Sunday runs was not adverse to Walker at all.

Second, Walker cites two instances when he experienced mechanical problems with his truck as evidence that Indian River began providing him with

19

inferior equipment.  But when asked during his deposition whether he had any evidence that these mechanical problems were related to his request for Sundays off, he responded "[I] don't know."  Doc. 14-11 at 67.  He also conceded that he lacked any knowledge about the maintenance that had been conducted on his truck or any evidence that anyone at Indian River had attempted to sabotage it.  In short, Walker has failed to cite any evidence showing that the isolated mechanical problems he experienced with his truck were due to Indian River having intentionally assigned him inferior equipment.

Third, Walker claims that he was subjected to heightened surveillance and discipline, but his only proof is his deposition testimony that Primavera was "argumentative" with him and that Ferguson was "aggressive" and "kept an eye on [him]" whenever he went into Indian River's offices.  Doc. 14-11 at 54.  This generalized testimony about Walker's interactions with other Indian River employees is too conclusory to raise a genuine issue of material fact that he suffered an adverse employment action.

But we cannot reach the same conclusion regarding Walker's testimony that he received only lower paying routes after he was removed from the milk route. Reducing an employee's pay constitutes an adverse employment action even under the more rigorous standard applicable to discrimination claims.  *See Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) ("Transferring

an employee to a job with lower pay is an adverse employment action."); *see also*

*Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998) (referring to a

reduction in pay as "patently adverse" for purposes of a claim under the Americans

with Disabilities Act).  As a result, Walker's testimony was sufficient to create a

genuine dispute of material fact as to whether he suffered an adverse employment

action.

Because Walker offered sufficient proof on the only disputed element of his

prima facie case of discrimination and retaliation, the burden shifts to Indian River

to articulate a legitimate, nondiscriminatory reason for offering Walker only lower

paying routes.  *See Crawford*, 529 F.3d at 976.  But this burden is easily satisfied

because Indian River explains that it only removed Walker from the milk route and

began offering him different local routes because it was attempting to

accommodate his request for Sundays off.  Thus, the burden shifts back to Walker

to show that this reason was pretext for an employment decision that was actually

motivated by discriminatory or retaliatory intent.  *Id.*

Walker has failed to carry his burden to show pretext.  He primarily relies on

Harned's testimony about two emails exchanged between Ferguson and Harned in

which they both referred to Walker as "problematic."[6]  In the first email, Ferguson

---

[6] The emails themselves are absent from the record.  Because we must view the evidence in the light most favorable to Walker, however, we will assume that the content of the emails is accurately reflected by Harned's deposition testimony about them.

21

told Harned that Walker was taken off the milk route because he was "problematic on that run" and "one of the primary issues was that . . . he require[d] Sundays off to attend church." Doc. 18-1 at 8. In the second email, which Harned sent in response to the first email, Harned asked Ferguson to keep him posted about Walker because "this guy is problematic." *Id.* at 11. These emails are insufficient to establish pretext because, without more, they reveal no impermissible bias against Walker. Ferguson labelled Walker as "problematic" only in the context of the milk route, which was unpredictable and required significant flexibility in drivers' schedules. When asked during his deposition whether Walker's request was "one of the things that made him problematic," Ferguson explained that the request "created issues for operations to handle *the account that [Walker] was on*," meaning the dairy account. Doc. 14-5 at 11 (emphasis added). And even though Harned's email in reply failed to indicate why he thought Walker was "problematic," Harned was merely responding to Ferguson's email, which, as we have explained, concerned why Walker had to be removed from the milk route specifically, not his religious practices or request for an accommodation more generally.

Walker also relies on another email from Harned in which he said that Walker "either needs to disappear or run [long haul routes]." Doc. 14-10 at 2. But again, the context of the email is crucial. Harned sent this email in response to

22

Primavera's email explaining that Walker had been complaining about not having a dedicated route and that she "c[ould] not make [Walker] [h]appy." *Id.* Her email made no reference to Walker's religious practices or request for an accommodation. Harned testified that in commenting that Walker needed to "disappear" or run long haul routes, he meant only that Walker was left with two options: find employment elsewhere or accept longer routes. Harned's email is insufficient to show an impermissible bias against Walker based on his religious beliefs.[7]

Finally, Walker relies on the purported statements by Godwin and Deliz during their meeting with Walker a day or two after he informed Indian River of his need for Sundays off. According to Walker, Godwin told him that he "c[ould not] let [his] religion get in the way of" his work, and Deliz said that his wife was "real serious about her church too . . . but . . . she'll put her job ahead of that." Doc. 14-11 at 29-30. Assuming, as we must, that Godwin and Deliz made these statements, Walker cannot rely on them as evidence that impermissible bias against his religious practices was Indian River's true motivation for beginning to offer

---

[7] Walker briefly argues that the emails discussed above constitute direct evidence of discrimination, but we disagree. Direct evidence of discrimination is evidence that, "if believed, proves the existence of a fact in issue without inference or presumption." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (alterations adopted) (internal quotation marks omitted). It consists of "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Id.* (internal quotation marks omitted). Ferguson's and Harned's emails fall far short of these criteria.

23

him only lower paying routes.  Even though Godwin and Deliz were involved in the decision to remove Walker from the milk route, Walker has presented no evidence that either one was involved in deciding which routes he was offered from that point forward.  The undisputed evidence shows that Deliz dispatched Walker only while he was assigned to the milk route; after he was removed from that route, Primavera became his new dispatcher.  From then on, Walker communicated with Primavera about the routes that he was being offered, including his desire for a dedicated local route.  And although the record shows that Ferguson and Harned became involved in Walker's scheduling after he requested an accommodation, Walker has put forward no evidence that either Deliz or Godwin had any say in Walker's assignments after Primavera became his dispatcher.  As a result, Deliz's and Godwin's statements do not establish pretext.

Because Walker has failed to come forward with sufficient evidence to establish pretext, his discrimination and retaliation claims fail as a matter of law. Therefore, the district court correctly granted summary judgment for Indian River on those claims.[8]

---

[8] Walker argues that the *McDonnell Douglas* framework is not the only means by which he can establish discrimination and that he presented "enough circumstantial evidence to raise a reasonable inference of intentional discrimination."  Appellant's Br. at 25 (quoting *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012)).  True, a triable issue of fact exists if a plaintiff presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation marks omitted).  But, for the

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Indian River.

**AFFIRMED.**

---

reasons stated above, Walker has failed to come forward with enough circumstantial evidence of discrimination for his claims to survive even under a "convincing mosaic" theory.

25